IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

--------------------------------X

DESHANE NICOLE DANIELS-CARRERO,   :

                                  :

                Plaintiff,        :

                v.                : 1:25-CV-1701

INOVA HEALTH CARE SYSTEM,         :

                                  :

                Defendant.        :

--------------------------------X


   Deposition of DESHANE NICOLE DANIELS-CARRERO

               Fairfax, Virginia

                April 1, 2026

                9:36 a.m. EST



Job No.:  626029

Pages 1 - 236

Transcribed by:  Jacalyn Mann

EXHIBIT 2

P R O C E E D I N G S

DESHANE NICOLE DANIELS-CARRERO,

having been first duly sworn to tell the truth, the

whole truth, and nothing but the truth, testified as

follows:

COURT REPORTER:  All right.                    22:22:19

Ms. Daniels-Carrero, please raise your right hand.

Do you solemnly swear or affirm under the

penalties of perjury that the testimony you shall

give will be the truth, the whole truth, and

nothing but the truth?

THE WITNESS:  I do, yes.                    22:22:37

COURT REPORTER:  Counsel, you may                    22:22:40

proceed.

EXAMINATION BY COUNSEL FOR THE                    22:22:44

DEFENDANT, INOVA HEALTH CARE SYSTEM                    22:22:44

BY MS. KIRKLAND:                    22:22:45

Q    Please state your full name for the                    22:22:46

record.

A    DeShane Nicole Daniels-Carrero.                    22:22:51

Q    And during your employment with Inova,                    22:22:59

was your last name only Daniels?

A    Okay.                                                    22:31:29

Q    Number 1 has a label at the bottom of              22:31:30
Inova 1990 to 1991.  Do you recognize this as a
copy of the offer letter for your most recent job
as a full-time employee of Inova?

A    Yes, ma'am.                                              22:31:50

Q    And it states that you would be employed          22:31:54
as an RN Staffing Solutions perioperative.  What
is that position?

A    Perioperative is within the OR.  It's in          22:32:06
the OR.

Q    Is your experience as a nurse solely in           22:32:14
the OR?

A    No.  Not before.  I've been in the OR              22:32:20
for, I'd say, nine years, almost 10 years now.

Q    At Inova, were you always assigned to an           22:32:33
OR?

A    Yes, yes.                                                22:32:37

Q    And what is the Inova Staffing Solutions           22:32:40
department?

A    Inova Staffing Solutions is an internal           22:32:46
float pool that they had just created or just

brought back, from my understanding.

Q    Okay.  And how does an internal float                22:33:01
pool work?

A    Well, it's kind of like a travel agency,            22:33:06
almost.  So they would -- I would go to each
hospital, different hospitals.  I would be
assigned to a hospital for 13 weeks.  And after
that 13 weeks, then they would assign me to a next
hospital, the next hospital, or possibly extend
sometimes.  It just depends.

Q    And were the assignments just based on              22:33:43
where a unit had a need for an extra nurse?

A    Mostly.  Mostly.                                     22:33:51

Q    Do you know of any other reason a float             22:33:53
pool nurse might be assigned to a hospital?

A    Not that I'm aware of.                               22:34:01

Q    Because the float pool nurses in                     22:34:08
Staffing Solutions can be assigned anywhere, were
they paid a higher salary than a unit-based nurse?

A    Yes.                                                 22:34:22

Q    Do you know how much higher of a salary?           22:34:23

A    I'm not certain, but I know it's less.             22:34:28

I'm not for certain of the exact amount, no.

Q    Meaning you know the unit-based    22:34:43

permanent nurses earn less?

A    Earn less, yes.  They do earn less    22:34:49

because they report to the same hospital every

day.

Q    In other words --    22:35:00

A    They're not expected to go -- sorry.    22:35:04

Q    I was going to say, in other words, the    22:35:08

float pool nurses receive more pay for their

flexibility; is that fair?

A    Right.  Right.    22:35:18

Q    The letter reflects that Dana Lowry    22:35:21

would be your initial supervisor in Staffing

Solutions; is that correct?

A    Yes.    22:35:31

Q    Okay.  And it reflects a start date of    22:35:33

January 23rd, 2023.  Do you know if that's

approximately the date you started?

A    From what I recall, yes.  It may have    22:35:47

been before or after.  I mean, like, I'm sorry.

It may have been a day after or whatever depending

Q   Okay.  Do you recall which hospital or
unit you were assigned to first?

A   Fair Oaks.

Q   Any particular department, or just their
OR?

A   Just their OR.

Q   Okay.  Let's look at Exhibit 2.

(Exhibit 2 was marked for identification
and attached to the transcript.)

Q   This is Inova 101.  Do you recognize
this as a chain from Elizabeth -- I think it's
Koenecke -- from February of 2023?

A   Yes.

Q   Okay.  And she has a title of Senior
Administrative Coordinator, Perioperative
Services, Inova Fairfax Hospital.  Is that the
unit you were working on?

A   This looks like Fair Oaks, yes.

Q   Okay.  And this exhibit seems to
indicate you were working four 10-hour shifts in
this assignment; is that right?

22:36:05

22:36:13

22:36:16

22:36:20

22:36:23

22:36:25

22:36:33

22:36:48

22:36:49

22:37:21

22:37:24

A     In this assignment, yes.          22:37:35

Q     Okay.  All right.  Now let's go to          22:37:38
Exhibit 3.

     (Exhibit 3 was marked for identification          22:37:42
and attached to the transcript.)

Q     This is Inova 213.  Do you recognize          22:37:49
this as an e-mail from you dated, April 20th,
2023, from to Dana Lowry and Trisa Fulwood?

A     Yes, I do.          22:38:38

Q     In that first paragraph -- let's see.          22:38:41
You wrote to notify them of certain incidents you
had been experiencing at Inova Fair Oaks.  These
incidents have been occurring since the two safety
incidents that I was counseled on about a month
ago, even though I do not feel I was at fault in
the first event.

     Do you recall what two safety incidents          22:39:12
you were counseled on at Inova Fair Oaks?

A     I do remember that there was an incident          22:39:22
about a light cord being placed on a patient, and
I was in the scrubbing role.  So therefore, I was
right beside the surgeon, and it was just -- the

case was going, but he saw unusual faces in his room.  So I guess, maybe, I didn't put on his correct gloves, and he chastised for me it.  And I said, I'm sorry; these were the ones that were pulled for you.  So I'll get the ones that you usually have.  And then he went on just a tangent, because he was upset.  But after that, I mean, the light cord was placed under my mail where I couldn't see it.  But while he was chastising us, saying we didn't have this or that or the other in the room, I was trying to, like, pay attention to what he was saying at the same time.  But at the same time, I was looking, like, where is that light cord.  I know I put all my stuff up there.  I'm just looking for it.  But I didn't want him to think I wasn't paying attention while he was chastising us.  But when we finally found it, I reported what we saw, that it almost burned a hole through the actual drapes, and I said that to them.  And then I got chastised for me placing it there.  And then I was like, Sorry, I didn't do that.  I didn't place it there.  I was looking for

it.  So --

Q    And is that event, then, the one that          22:41:50
you felt wasn't your fault?

A    Right.  Right.  And I addressed it with         22:41:56
the manager and talked to her about her it.  And I
even assessed the patient as well, to see if there
was a burn in the drapes.  And I even tried to
place my finger through the hole, that looked like
it was a hole, but it wasn't a hole, and I even
told her about this.  I wrote it up just as it was
happening.  And he was like, Well, you almost set
the patient on fire.  And I was like, No, I
didn't.  I knew those drapes -- I knew that light
could get hot.  So I would never place it directly
on a patient.  But that wasn't -- my voice wasn't
being heard then, so --

Q    When you referred to the doctor, you           22:42:55
said he.  Do you recall who the surgeon was?

A    Kind of.  But I don't know his true,           22:43:06
true name.  I don't remember his name, but if --
yeah.  If someone said his name, I would say yeah.

Q    Does Dr. Ahmed sound right?                     22:43:21

Q    This e-mail is dated April 20th, 2023.          23:01:01

Do you know if, at this point, your assignment at

Inova Fair Oaks was ending?

A    Well, I knew it was ending.  I did know          23:01:17

it was ending in April, yes.

Q    All right.  Let's look at Exhibit 4.          23:01:24

     (Exhibit 4 was marked for identification          23:01:27

and attached to the transcript.)

Q    This is Inova 211.  Do you recognize          23:01:35

this as an e-mail from Ms. Fulwood, dated

April 20th, 2023 at 4:52 p.m.?

A    Yes.          23:01:55

Q    This reflects that your next assignment          23:01:56

was to Inova Fairfax Hospital Tower OR beginning

April 24th, 2023 until July 24, 2023; correct?

A    Yes.  Yes.          23:02:14

Q    Okay.  Let's look at Exhibit 5.          23:02:17

     (Exhibit 5 was marked for identification          23:02:18

and attached to the transcript.)

Q    Exhibit 5 is Inova 214 to 215.  On the          23:02:27

first page, the second e-mail, kind of in the

middle of the page, do you see an e-mail from you,

dated April 21st to Jamie Addo, Ashley Smith, and
Shaunda Trimner?

A    Yes.                                        23:03:13

Q    Do I understand from this e-mail that,       23:03:14
at this point, in April '23, you were preferring
to work three 12-hour shifts?

A    It looks like it, yes.                       23:03:25

Q    And it looks like you write that was for     23:03:27
quality-of-life and also a plan to resume classes
to complete your MSN program, right?

A    Yes.                                         23:03:41

Q    What MSN program are you referring to        23:03:43
here?

A    To the one at GW or Georgetown.  I           23:03:49
hadn't applied to either one of them just yet, I
believe.

Q    Okay.  So there was no program already       23:04:02
starting, just one --

A    Yes.  That I was trying to -- I was just     23:04:08
going to.  Right.  I mean, I don't think so.
Yeah.  I don't remember, yeah.  I'm not sure.  I
don't remember.  I don't think I was in the

After you sent this e-mail requesting three 12-hour shifts, do you recall any conversation with Ms. Addo or Ms. Lowry about what shift you would be working?

A    I believe on this first assignment, I had to work two twelves, two eights, yes.  Yeah. I had to -- I didn't get the three twelves, and I didn't -- yeah.  I didn't get any of that.          23:06:32

Q    And do you have any understanding of why you needed to work that shift, the two twelves, two eights?          23:06:51

A    Because at that facility, that was what was required.  Most of them worked two twelves, two eights, most.  The majority of them, but not all of them.  But not all of them.          23:07:02

Q    Do you recall any discussion with Ms. Lowry about the difference in working in the internal float pool as compared to when you were an agency nurse and could dictate your desired shifts?          23:07:23

A    She did not voice to me.  And not at the beginning of when I got hired, no.  That was no --          23:07:44

nothing stated about me having to work night shift

full time all the time, or swing shifts full time

all the time.  No.

Q    You said at the time of hire.  Was there                23:08:09

any conversation like that after the time of hire?

A    I believe, maybe, when I sent this                       23:08:19

e-mail, then she said that -- because after we

discussed it with the two managers, then I believe

they said, Hey, well, we here do the two twelves,

two eights, day shift, and I said okay.

Q    Okay.  Let's look at Exhibit 6.                          23:08:44

     (Exhibit 6 was marked for identification                23:08:48

and attached to the transcript.)

Q    This is Inova 298.  Do you recognize                     23:08:58

this e-mail from Trisa Fulwood, dated June 30,

2023?

A    Yes.                                                     23:09:31

Q    It looks like your assignment with Inova                 23:09:33

Fairfax Hospital Tower OR is now being extended to

August 18th, '23?

A    Yes.  That's what I thought too.  Yes, I                 23:09:47

did.  I thought that.

Q   And who was your nursing manager at the   23:09:56
unit at Tower OR?

A   The manager, it was Addo, Jamie Addo,   23:10:06
and Ashley Smith there on here.  Yeah.  That's the
names, I believe.

Q   Okay.  Robin Meshach wasn't at that   23:10:17
hospital; correct?

A   No.  She was not there.  No, she was   23:10:25
not.

Q   She was not your nursing manager in the   23:10:30
summer of 2023?

A   The summer, no.  Wherever I was, I was   23:10:37
here, yes.

Q   Okay.  If you could turn to Exhibit 7,   23:10:44
which is Inova 305.

    (Exhibit 7 was marked for identification   23:10:50
and attached to the transcript.)

Q   Do you recognize this as an e-mail from   23:10:58
you, dated July 11th, 2023?

A   Okay.  Okay.   23:11:26

Q   You write in this e-mail you were   23:11:29
recently approved to switch your schedule for your

contract extension to five by eights instead of

two by eights and two by twelves, right?

A    Yes.  Yes.                                23:11:47

Q    And just for clarity, when you write       23:11:49

five by eights, is that five eight-hour shifts?

A    Yes, ma'am.                               23:11:57

Q    Okay.  So you were switching to five      23:11:57

eight-hour shifts as opposed to the two eight-hour

shifts and two 12-hour shifts scheduled?

A    Yes.  Yes.  Because it was an extension    23:12:13

at the Tower, at the hospital, yes.

Q    Okay.  And do you recall who you had       23:12:21

discussed switching your schedule with?

A    It had to be either Jamie Addo --         23:12:30

probably Jamie Addo.  I don't think I really

talked to Ashley Smith at that time, so -- I don't

think so.  I think it was Jamie.

Q    And do you recall anything about that      23:12:46

discussion?

A    Well, I know I had just got diagnosed.     23:12:50

I don't know.  I know that I was having to -- I

think it was maybe getting diagnosed with MS and

Q    Do you recall if, at this point, you                23:34:25

were considering leaving Inova Staffing Solutions?

A    I don't know.  I don't know why I sent              23:34:38

that myself.

Q    Okay.  Do you know if you applied for               23:34:44

any of these jobs?

A    No.  Not that I recall.                             23:34:50

Q    Let's go to Exhibit 9, then.                        23:34:55

     (Exhibit 9 was marked for identification            23:34:59

and attached to the transcript.)

Q    These were text messages that Dana Lowry            23:35:07

provided.  Do you recognize these as texts with

you, Ms. Lowry, and one other person, starting on

July 24th, 2023?

A    Yeah.  I recognize that.  I don't know              23:35:44

what they're saying about the schedule, but okay.

Yeah, I see.

Q    In the first text, it looks like you're             23:36:10

informing her that you'd been admitted to the

hospital since Saturday; is that right?

A    Yes.  Because I woke up, and it was over            23:36:22

the weekend, and then I got sick, yes.

Q    Okay.  So this would have been around     23:36:29
July 24, 2023, you had already been there a few
days, you think?

A    Maybe, like, two, I want to say, and     23:36:40
then they kept getting the imaging wrong.  And
then I said, Okay.  I can't stay here, yeah.

Q    Okay.  If you can flip back, then, to     23:36:53
Exhibit 7, your conversation with Ms. Addo to
switch your schedule, then, occurred prior to your
hospitalization, right?

A    Okay.     23:37:14

Q    Does that refresh your memory in any     23:37:16
way, as to why you were switching your schedule or
what reason you were giving for switching your
schedule earlier in July?

A    I know I was getting tired and sleepy     23:37:35
driving home.  Every day I was getting the
fatigue, and I did notice it, but I didn't know
what it was.  But, yeah.  Every time I would drive
home, I would go to sleep on the road and force
myself to be up.  I don't know how to explain
that.

Q    You agree, though, that at this point,
you wouldn't have had a recommendation from
Dr. Dave that you could only work eight-hour
shifts, right?                                         23:38:09

A    Right.  Not at that point, no.  It was
after.                                                 23:38:21

Q    Okay.  Going back to Exhibit 9, to those
text messages we were just looking at.                 23:38:25

A    Okay.                                             23:38:34

Q    The next set appears to be on July 27th,
2023, where you ask if there's any way for them to
redo your schedule because it's totally wrong.  Do
you see that that text from you?                       23:38:36

A    Okay.  Okay.                                      23:38:52

Q    If you look at the following page, that
same text chain continues.  There's a photo, it
looks like you sent, of your schedule.  And does
this reflect what you thought your schedule was
supposed to be starting July 31st, the five
eight-hour shifts?                                     23:38:54

A    Yes.  I thought I was going to be
working five eight-hour shifts, yes.                   23:39:20

Q    Okay.  So are you asking Ms. Lowry and
whoever else is on this text chain to have them
fix the system so it matches what you're sending
here?  Am I following this chain right?                    23:39:26

A    Yes.  Yes.  Yes.                                      23:39:42

Q    Okay.  So as of this time when you were                23:39:45
in the hospital, you already had the five
eight-hour shifts scheduled; correct?

A    Right.  Per the e-mail, she had agreed                 23:39:53
to it, you know, and in verbal communications she
told me it was fine.

Q    Okay.  Look at the next page, which, is               23:40:04
Inova 2833.

A    Which one?                                            23:40:12

Q    Just the next page in Exhibit 7.                      23:40:15

A    Okay.  Sorry.                                         23:40:20

Q    There's a text in green from Ms. Lowry.              23:40:22
Do you see she writes, This is Trisa's office
number, not her cell?  Do you think that might
have been who this other recipient had intended to
be?  Would it have been Trisa Fulwood that you
were trying to text?

Q    -- we can take a break.  All right,    23:42:02

Exhibit 10.  Do you recognize this as a medical

record you produced in discovery relating to a

visit with Dr. Rahul Dave on August 4th, 2023?

A    Yes.    23:42:22

Q    And it has a Bates stamp of Daniels    23:42:23

medical record 185 to 243 at the bottom.  I'll try

to use those page numbers to direct you through

here.

A    Okay.    23:42:41

Q    On this first page, though, right where    23:42:42

we are, it looks like you see him August 4th,

2023.  And it says, Patient is having an

evaluation for MS.  Is this the first visit with

Dr. Dave, then?

A    In August?  Where did you say it was?    23:43:00

Q    Yeah.    23:43:06

A    Oh, at the top.  Yes.  Okay.  Yes.    23:43:08

Q    And is this evaluation to determine    23:43:16

whether you have MS?

A    Yes.  Because I wanted confirmation,    23:43:22

yes.

Is this something you were reporting to
Dr. Dave during this visit?

A    Well, I told him I was having
difficulties in staying awake during the evening
shift.  But, other than that, no.  I wasn't having
any issues.

Q    By this point, you are working the five
eight-hour shifts; correct?

A    No.  I don't believe so.  I think --

Q    Let's go back.  Yeah.  Let's go back to
Exhibit 9.

A    Okay.

Q    That second page had that photo of your
schedule.

A    You said 9?

Q    9, yeah, the texts.  The second page of
that exhibit, I think.

A    Oh, the second page.

Q    Yeah.  Here.

A    Okay.

Q    Here's that photo.  This reflected you
were starting the five eight-hour shifts on

July 31st; correct?  Is that right?

A    July 31st, okay.  Yeah.  They had                 23:48:06
switched me, yes.  Okay.

Q    When you were working eight-hour shifts           23:48:13
at Inova Fairfax Tower OR, what were your hours?

A    Well, the first time it was -- the first          23:48:22
time I was there, it was 12 -- I'm sorry.  Two
twelves, two eights.  Then, when I asked her, and
had a conversation with her.  Then she changed me
to the day eights.

Q    So at this point, beginning July 31st,            23:48:46
2023, what hours where you're working, or days?

A    7:00 to 3:30, or maybe sometimes 6:00.            23:48:55
I think we were talking about 6:50, I think it is.
I don't remember exactly -- like, exactly what
time we had to clock-in, but I know it was like
7:00 to 3:00, was the day shift, for sure.

Q    Okay.  So by 7:00 a.m. to roughly 3:00            23:49:17
or 3:30 p.m.?

A    Yes.  Yes.                                        23:49:25

Q    So you wouldn't have been working an              23:49:27
evening shift at this time; correct?

A    Correct.  It seems so, yes.                         23:49:34

Q    Do you recall reporting to Dr. Dave any            23:49:38
difficulty working in the OR?

A    When I would have to work beyond, like,            23:49:46
for my normal time, because I told him I was
having issues with the sleeping, where I can't
sleep very well.  So -- and I would get fatigue.
And if I worked anything beyond that -- beyond the
eight hours, then, yeah.  I had to sometimes pull
over in my car and take a nap and then finish
driving home.

Q    Are you still on the records?  If you             23:50:24
could look at the Daniels medical record 213 at
the very bottom.  Do you see where it starts the
heading of Plan at the very bottom?

A    Yes.                                                23:50:41

Q    If you then to the next page, under the           23:50:43
plan, I guess the fourth line, it reads, She may
require the next seven days off work due to
emergent treatment.  Do you see that line?

A    Yes.                                                23:51:00

Q    Do you know what emergent treatment you           23:51:02

may have required in those seven days?

A    I think he wanted me to automatically                23:51:10
start that medication that he was referring to as
Tysabri.

Q    Sorry.  Can you say that again?  Which                23:51:23
one?

A    He wanted me to automatically start the              23:51:27
medication of Tysabri, like, immediately.  But I
didn't think I could get seven days off, so --

Q    Do you know if you asked for those seven             23:51:43
days off?

A    No.  Because I asked him to give me a                23:51:49
little time to think it over, because the dangers
of the medication was scary, and this disease was
all new to me.  So, I mean, you're talking about a
person who just takes, maybe, Advil p.m. at night
to go to sleep.  And then he told me, this
medication, he can't keep me on it for longer than
two years, because at the two-year mark, I could
either -- if my levels go too high, I could either
die or become 100 percent disabled.  So I didn't
know how to take that.  So I told myself, I need

maybe a day or two to think about it before I make this big decision, because it is a big decision, I would say.  So I didn't.  I don't remember taking requesting off.

Q    Here's a Kleenex.                                    23:53:22

A    Sorry.                                               23:53:24

Q    Do you recall when you did start that               23:53:25
medication, or if you did?

A    I did.  I did start it.  I started it in             23:53:31
-- well, he let me do a round of steroids first.
And then he said -- because he noticed it got
better, then we should start the Tysabri.  So I
started it, I think, in November, I believe.

Q    If you can look at Daniels medical                   23:54:02
record 230.  It's in the same exhibit, but around
Page 46.

A    Okay.                                                23:54:28

Q    This is a section of the record called              23:54:29
After Visit Summary.  Do you see this?

A    Yes.                                                 23:54:36

Q    On 233 in this section, so two pages                23:54:38
over, it says to return in about two months around

Q    It's Inova 478.                                          23:56:33

A    Okay.                                                    23:56:39

Q    Do you recognize this as an e-mail that                 23:56:40
you received from Ms. Fulwood?  It looks like you
first received it.  It's dated July 20th, 2023,
and it looks like it was sent to you again, dated
August 2nd, 2023.  Do you see that?

A    Yeah.  It looks like it.                                 23:57:12

Q    And from this e-mail, it looks like your                23:57:16
next assignment was to be at Inova Fairfax
Hospital's Women's OR starting August 20th, 2023
until November 19th, 2023; is that right?

A    Yes.  It looks like it, yes.                             23:57:36

Q    Do you know if you had any issues or                    23:57:38
concerns brought to your attention with your
performance or conduct during that assignment to
the Women's OR?

A    No.  Not in my conduct, no, ma'am.  I                   23:57:53
mean, one time they called me in the office about
something about a surgeon, because he was yelling
at us the entire time.  Like, he was yelling at
everybody in the room, and the manager wanted to

discuss that issue with us, the team, and see how we felt about it.  And, you know, I told her, I didn't feel any way about it.  We just listened to what he had to say.  I don't know, I said.  We just stood there and took it, whatever it was.

Q    Do you recall who that manager was?                    23:58:46

A    I don't know her name.  I can't remember it.                    23:58:53

Q    The issue, though, as I understood it, had nothing to do with you or your performance, but related to them asking about the surgeon?                    23:58:58

A    Right.  Yeah.  I don't remember any other instances.                    23:59:10

Q    Do you recall what your schedule was when you were working for the Women's OR?                    23:59:16

A    Eight hours.  I remember that.                    23:59:23

Q    Five days a week?                    23:59:25

A    Yes, ma'am.                    23:59:28

Q    Would it have been the same, roughly 7:30 in the morning until 3:00, 3:30 in the afternoon?                    23:59:30

A    Well, yes.  But before this -- well,                    23:59:37

Q    Do you remember being interviewed for a director-level position?                                      00:25:50

A    I think I recall -- no.  I don't remember that.                                                        00:25:56

Q    All right.  Let's move on to Exhibit 13, then.                                                         00:26:01

(Exhibit 13 was marked for identification and attached to the transcript.)          00:26:07

A    Okay.                                                                        00:26:14

Q    Do you recognize these as a medical record you produced in discovery relating to an October 18th, 2023 visit with Dr. Dave?    00:26:15

A    Yes.                                                                         00:26:33

Q    And it's stamped Daniels medical record 244 to 276.  Would this have been the next time you saw Dr. Dave after that initial August evaluation?                                               00:26:35

A    Well, maybe.  Probably so, because it said October.  October 4th, right?  I don't know.  Probably.  I'm guessing, because I know before he said I was supposed to be there before October 15th.  Because I'm pretty sure this was my    00:26:58

second visit, because this was all the labs.  This
is everything that came back; correct?

Q    Yeah.  You can take a minute to look
through it.

A    Yeah.  Let me look through it.  Yes.
This had to be my second one.  Yeah, it had to be
my second one, because it says I would recover
with the steroids, and I had an aggressive form of
MS.

Q    Starting on the first page, then,
Daniels medical record 244, were you reporting
blurry vision at that time?  Do you remember
reporting that?

A    I told him that sometimes it comes and
goes, yes.  It depends on -- yes, probably.  I
don't know.  I'm pretty sure it comes and goes.  I
can't predict it sometimes.

Q    It wasn't such that it prevented you
from working in the OR, though?

A    No.  But -- no.  No.

Q    And then, on Page 252, which it says
Page 68 at the bottom too, but Daniels medical

A    Yes, ma'am.                                    00:33:10

Q    And under HPI, the third line had             00:33:12
stated, Feels much better after steroids, and did
not start -- you said it nicely earlier, but is it
Tysabri?

A    Tysabri.                                       00:33:37

Q    Okay.  Is this what you were referring        00:33:42
to that confirmed this was your second
appointment?

A    Yes, I believe.  Yes.  Yes.  That was my      00:33:54
first appointment after the steroids, yes.  And we
were still doing exams, I believe.

Q    Two pages later, Daniel's medical record      00:34:09
261, there's an assessment plan section.  Do you
see that?  It's Page 77 as well.

A    Okay.                                          00:34:24

Q    In the paragraph under the numbering, it      00:34:24
states, 36-year-old female with confirmed MS
diagnosis.  Is this the appointment at which that
diagnosis is finally confirmed?

A    Yeah, yeah.  Yes.                              00:34:50

Q    He also writes, Though she had a good         00:34:54

recovery with steroids, she has numerous factors

below that suggest an aggressive form of MS.  Was

this you're first learning this from Dr. Dave?

A    Yes.                                                      00:35:13

Q    Up below the heading Assessment Plan, it                 00:35:17

states, Return in about two months, around

December 18th, 2023 for Dave.  Would that have

been the next time you saw Dr. Dave?

A    Yes.                                                      00:35:37

Q    Take a minute and look through these                     00:35:39

records.  My question is, if there's anything in

these records that reflect that, at this point in

time, Dr. Dave was recommending any change to your

work environment?  You're welcome to look through

that.

A    I know.  I already know immediately he                   00:36:07

did.  He did.

Q    In October of 2023?                                      00:36:14

A    Yes.                                                      00:36:17

Q    And what were the workplace                              00:36:19

accommodations he was recommending in these

records?

MR. STRELKA:  Objection to form.  Answer                    00:36:28
if you can.

A     I don't know.  I just know it was                    00:36:44
aggressive and --

Q     My question had been, do you see                    00:37:13
anything in these records reflecting that Dr. Dave
was recommending any workplace accommodations.
And you said, I know he did.  And I'm asking you
to tell me where in the records you see that.

A     Verbally, I know he said that, because I                    00:38:12
told him I was having issues with the fatigue, and
when I had to work anything over eight hours, that
I would get sleepy.  And I told him, I'm still
having trouble sleeping at night myself.

Q     At this point, in October of 2023, you                    00:38:42
were working eight-hour shifts, though, right?

A     Yes.  I know, yes.                    00:38:51

Q     Let's go to Exhibit 14, if we could.                    00:38:55

(Exhibit 14 was marked for                    00:38:58
identification and attached to the transcript.)

A     Okay.                    00:39:05

Q     Do you recognize these as medical                    00:39:07

records that you produced in discovery relating to

a visit with Dr. Dave on December 18th, 2023?

A    Yes.                                                 00:39:28

Q    And would this have been your third               00:39:30

visit to Dr. Dave?

A    Yes.  After I started treatment.                   00:39:35

Q    Would it have not been your third visit            00:39:40

entirely with Dr. Dave?

A    No.  That, maybe.  I don't know.  Maybe.           00:39:48

Q    We looked at an August 4th, 2023 visit,            00:40:04

an October 18th, 2023 visit, and then this one.

Do you believe there were any others in between?

A    No.  I don't think so.                             00:40:21

Q    If you could look at Daniels medical              00:40:25

record 291 in this exhibit.

A    Which one is it?                                   00:40:36

Q    Daniels medical record 291 or Page 107.           00:40:38

A    107, okay.                                          00:40:45

Q    And under the HPI, do you recall                  00:41:01

reporting to Dr. Dave that, at this time, you were

sleeping from 7:30 p.m. to 4:00 a.m.?

A    Yeah.  That's usually.                             00:41:22

Q    Sometime between your second visit with
Dr. Dave and your third visit, you started that
medication?

A    Yes.  Because he said, After the
steroids.  Now, I had to make the decision by
then.

Q    Do you recall if you applied for family
medical leave after this visit?

A    Yes.  I believe so, yes.

Q    At Inova, how did employees apply for
family medical leave?  What was the process?

A    You have to notify your manager, I
believe it was.  I can't remember exactly.  But I
remember they had a card that had listed
everywhere in the building, that you could pick up
the card, call them, and apply for it directly
through them.

Q    Do you recall, Inova used a third-party
administrator, the Hartford?

A    Yes.

Q    Is that what you were referring to?

A    I was able to.  Yes, ma'am.

Q    So that -- you submitted your request
for family medical leave through the Hartford?                    15:29:18

A    Through the Hartford, yes.                                   15:29:25

Q    Okay.  And was that request for
continuous leave or intermittent?                                 15:29:28

A    Intermittent.  Intermittent.  That's all
I wanted.                                                         15:29:36

Q    Okay.  On the same page, it looks like
under Assessment Plan it states, Return in about
three months or around March 18th for Dave.  Do
you know if that's the next time you saw him?                     15:29:41

A    Possibly, yes.                                               15:30:01

Q    All right.  We can look at Exhibit 15.                       15:30:04

     (Exhibit 15 was marked for                                  15:30:06
identification and attached to the transcript.)

Q    Let's start on the second e-mail.  Are
you on Exhibit 15?  It's Inova 581 to 589.                       15:30:14

A    The second one?                                              15:30:28

Q    The first page.                                              15:30:31

A    First page, okay.                                            15:30:33

Q    Do you see the second e-mail on this
page, an e-mail from Dana Lowry to Karen Farrah                  15:30:35

and to you, with a cc to Trisa Fulwood, dated
December 21st, 2023?

A    Yes.  Yes, I do.                                    15:31:02

Q    Okay.  And in this e-mail, Ms. Lowry              15:31:04
writes, DeShane is asking for IFMLA for callouts
and is requesting eight-hour shifts.  I think she
will need accommodation paperwork in addition to
intermittent FMLA.  I've cc'ed her on the e-mail.
Would you please send her the accommodation
paperwork.  Do you see that?

A    Yes.                                               15:31:42

Q    Did you know who Karen Farrah was at               15:31:44
this time?

A    I think -- no.  I didn't know her, like,           15:31:52
personally, no.

Q    Had you contacted anyone else in HR as             15:32:00
of this time?

A    Not that I recall.  I don't know.  I               15:32:15
don't think so.

Q    Had you had a conversation with                    15:32:19
Ms. Lowry that prompted her to reach out to Karen
Farrah, if you know?

to Ms. Lowry and to you, with a cc to Ms. Fulwood,
dated December 21st, 2023, the top e-mail on the
first page?

A    That e-mail on this first page right                15:34:55
here?

Q    Yeah.                                               15:34:58

A    Okay.  Yes.                                         15:35:00

Q    Okay.  Do you recognize this is an                  15:35:02
e-mail from Ms. Farrah, where she sent you
reasonable accommodation of disability policy and
related forms?

A    Yes.                                                15:35:17

Q    And if you look at the attachments here,            15:35:19
Inova 582 to 589, are these the policies and forms
that she sent you?

A    Yes.                                                15:35:34

Q    And this is the first time you recall              15:35:39
communicating with Ms. Farrah?

A    Yes.  To my understanding.                          15:35:46

Q    Okay.  Let's look at Exhibit 16.                    15:35:48

     (Exhibit 16 was marked for                          15:35:53
identification and attached to the transcript.)

A    Okay.                                              15:36:02

Q    It's Inova 683 to 687.  Do you recognize          15:36:03
this is an e-mail from you to Ms. Farrah,
Ms. Lowry, with a cc to Ms. Fulwood, dated
January 7th, 2024?

A    Which one are you saying?                          15:36:23

Q    The top e-mail on Exhibit 16.                      15:36:26

A    Oh, okay.  16.  Okay.                              15:36:31

Q    The very top e-mail.                               15:36:35

A    Yes.                                               15:36:43

Q    Okay.  And there are attachments here.             15:36:45
Is this you were returning paperwork back to
Ms. Farrah and Ms. Lowry relating to
accommodations?

A    Yes.                                               15:37:04

Q    Let me look at the attachments here,               15:37:06
Inova 685 to 687.  This is the paperwork attached
to that e-mail?

A    Yes.                                               15:37:19

Q    Starting on that first page of the                 15:37:20
attachment, the reasonable accommodation request
form.

A    Yes.                                          15:37:28

Q    Is this a form that you completed            15:37:30
yourself and signed and dated January 4th, 2024?

A    Yes.                                          15:37:45

Q    In other words, this is your handwriting     15:37:47
and your signature?

A    Yes.                                          15:37:50

Q    Okay.  And on this form, you're             15:37:52
requesting eight-hour shifts in a day due to
fatigue; correct?

A    Yes.                                          15:38:03

Q    At this point, in January of 2024, do       15:38:05
you recall if you were already working eight-hour
shifts?

A    Yes.                                          15:38:16

Q    If you look at the next two pages, is       15:38:20
this a letter you had received from Dr. Dave,
dated December 21st, 2023?

A    Uh-huh.                                       15:38:36

Q    And this is the only letter from him you    15:38:38
attached to this January 7th, 2024 e-mail;
correct?

A    Yes.  I didn't catch that.

Q    Okay.  If you look at the second
paragraph, what reasonable accommodations does
Dr. Dave recommend in this letter?

A    The up to five days per month for
symptoms that impair her ability to work,
temperature and humidity, controlled environments,
excessive heat and cold.  He says that humidity
can worsen my symptoms.  And time off due to
scheduled appointments.

Q    Was the temperature or the humidity in
the OR such that you weren't able to work in that
space, or was it sufficient?

A    It was sufficient if I was moving
around.

Q    Do you see anything in this letter from
Dr. Dave, dated December 21st, 2023 that
recommends eight-hour shifts?

A    No.  No.  Not in that one, no.

Q    Let's look at Exhibit 17 next.

     (Exhibit 17 was marked for
identification and attached to the transcript.

15:39:02

15:39:07

15:39:35

15:40:02

15:40:15

15:40:24

15:40:45

15:40:49

15:40:51

Q    Starting with that second e-mail in here, do you recognize this as an e-mail dated October 19th, 2023 from Staffing Solutions that would advise you that you would be assigned to Inova Alexandria Hospital from November 20th, 2023 to January 27th, 2024?                    15:40:58

A    Yes.                    15:41:27

Q    Okay.  And then, above that is an e-mail from Robin Meshach.  Who is Robin Meshach?                    15:41:28

A    She was the manager then.                    15:41:39

Q    Had you worked with her before?                    15:41:41

A    Yes.                    15:41:43

Q    Was that during your time as an agency nurse before?                    15:41:45

A    Yes.  Yes.                    15:41:50

Q    Okay.  Had you had any issues or problems with Ms. Meshach?                    15:48:20

A    No.  No.                    15:48:26

Q    In her e-mail, walking you back, she states that she's attaching a copy of your schedule.  Do you see that?  And the schedule at Inova 560 reflects that there'd be three days of                    15:48:30

orientation, and then three 12-hour shifts a week;
correct?

A    Yeah.  It looks like she did.  I don't
know, but I don't remember this schedule.  I've
never seen this schedule.                                    15:49:10

Q    Okay.  Do you recall discussing with          15:49:23
Inova Alexandria Hospital, when you started, that
you preferred five eight-hour shifts as opposed to
three 12-hour shifts?

A    Yes.                                            15:49:38

Q    Do you recall who that discussion was          15:49:40
with?

A    It would have to be the charge nurse or        15:49:47
the manager.  They're the only ones who can really
change your schedule.

Q    And they did change your schedule to           15:49:56
five eight-hour shifts; correct?

A    Yes.                                            15:50:03

Q    Okay.  And that was changed prior to           15:50:04
your December 18th, 2023 visit with Dr. Dave, if
you recall?  Do you remember?

A    I don't remember that.                          15:50:32

Q    Okay.  And you don't recall what time
you spoke with Inova Alexandria to switch to
eight-hour shifts?

A    I remember, once we had that discussion,
I remember working eight-hour shifts.  I don't
remember at what point, but --

Q    Let's look at Exhibit 18.

     (Exhibit 18 was marked for
identification and attached to the transcript.)

A    Okay.

Q    This is Inova 646 to 648.  Do you
recognize this top e-mail as an e-mail from Dana
Lowry to you, Ms. Farrah, and Ms. Fulwood, dated
January 10th, 2024?

A    Yes.

Q    And she writes, Thank you for sending in
your documentation.  We're reviewing your request,
and we will set up a time to meet; correct?

A    Correct.

Q    Okay.  Let's go to Exhibit 19.

     (Exhibit 19 was marked for
identification and attached to the transcript.)

Q    That is Inova 738 to 740 and 680.  Let's          15:53:45
start on Inova 740, the third page of Exhibit 19.

A    Which one, you said?          15:54:02

Q    It's Inova 740.  It's the third page of          15:54:06
Exhibit 19.

A    Oh, the third page.  Let me go to that          15:54:12
one.  Okay.

Q    On this page, do you recognize a          15:54:14
Microsoft Teams meeting invite from Dana Lowry
sent on January 16, 2024 to you and Ms. Farrah and
Ms. Fulwood and herself?

A    Possibly, yes.          15:54:46

Q    It appears to be scheduling the meeting          15:54:48
for January 18th at 4:00 p.m.; correct?

A    Yes.  Yes.          15:55:00

Q    Can you look at the last page of this          15:55:02
exhibit, which is Inova 680?  The last page.

A    Oh, the last page.          15:55:12

Q    One more.          15:55:14

A    All right.          15:55:17

Q    Do you recognize this as an e-mail from          15:55:18
you, dated January 17th, 2024 accepting that

accommodations touch-base meeting?

A    Okay.                                                  15:55:31

Q    Okay.  We can go back to Inova 739.                   15:55:32

A    Okay.                                                  15:55:40

Q    The bottom e-mail, do you recognize this              15:55:41
as an e-mail from Dana Lowry, dated January 18th,
2024 at 4:22 p.m.?

A    Okay.  Yes.                                            15:55:55

Q    She writes, We missed you on the meeting              15:55:57
to discuss your accommodations.  We stayed on
until 4:21.  Please send us your availability to
make time to review and discuss next week;
correct?

A    Yes.                                                   15:56:19

Q    You agreed to attend that Teams meeting               15:56:21
on January 18th?

A    Yes, I did.                                            15:56:37

Q    At the top of that page, on Inova 739,                15:56:41
Ms. Fulwood sends an e-mail asking you for a
couple of dates and times to reschedule the
meeting; correct?

A    It looks like it.  I don't remember                   15:57:14

another one.  Where do you see the other one?

Q    My question was, at the top of Inova          15:58:26
739, Ms. Fulwood is asking you for a couple dates
and time to reschedule the meeting.  Do you see
that e-mail?

A    Oh, yes.          15:58:39

Q    All right.  And on the first page, Inova          15:58:42
738, you reply with Monday at 4:30 p.m.; correct?

A    Is that what it says?  Okay.          16:21:20

Q    Do you see that e-mail?  It's sort of          16:21:26
towards the bottom.  I want to make sure you're
with me.

A    January 19th was the 4:30, okay.  I          16:21:39
responded back with the 4:30.

Q    Okay.  4:30 on Monday.  And then, do you          16:21:47
see above that in the chain, at the top,
Ms. Fulwood says she'll schedule that meeting now?
Do you see that?

A    I see her e-mail, yes.          16:22:05

Q    Let's look at Exhibit 20.          16:22:12

     (Exhibit 20 was marked for          16:22:14
identification and attached to the transcript.)

Q     This is Inova 882, 894 to 896.  I'm                16:22:21

going to start on 896 at the bottom.  The last

page of Exhibit 20, the very bottom e-mail.

A     Oh, the bottom.  Right here.                        16:22:42

Q     On the last page of Exhibit 20, it has             16:22:45

Inova 896 that the bottom.

A     Oh.  All the way.  Okay.                            16:22:55

Q     This bottom e-mail, do you recognize               16:23:01

this as a Microsoft Teams invite sent by Trisa

Fulwood on January 19th, 2024 to yourself, to

Ms. Farrah, to Ms. Lowry, and to you, setting a

meeting for Monday January 22nd at 4:30 p.m.?

A     I guess so.                                         16:23:33

Q     In the e-mail above that, do you                   16:23:35

recognize that e-mail from Dana Lowry on

January 22nd sent at 4:44 p.m. to you, Ms. Farrah,

and Ms. Fulwood stating, We stayed on the call

until 4:45.  This is the second time we've tried

to meet with you regarding your accommodation

request.  Please follow up, if this is something

you want to pursue?

A     I replied, I'm sure, yes.                           16:24:14

A    Oh, below it?                                           16:27:24

Q    Your first reply, which goes into the                   16:27:28
top of the next page, was you were not notified of
the exact date of the meeting; correct?

A    You're saying that I scheduled it for                   16:27:44
4:30 the day before?

Q    Uh-huh.  And the Teams invite is in the                 16:27:52
same chain; correct?  In other words --

A    I'm guessing.  I'm guessing, but I --                    16:28:08

Q    On January 22nd, when you replied, you                  16:28:10
don't say someone didn't relieve me on time.  You
say you didn't receive the link for the meeting;
correct?

A    I didn't see the meeting, yeah.                          16:28:26

Q    And you didn't reach out to ask for the                 16:28:29
link either?

A    Well, I thought they were going to call                 16:28:37
me at first, at some point, because I told her, if
I couldn't get out, then there was no way for me
to tell her that I can't get out, or I'm stuck in
a room.  And that's why I told her, If it's at a
certain time, let's schedule it, and let my

if it got lost in the e-mails, I never -- I don't
see the link.  I don't see the link here.

Q    On Inova 896, you don't see the link at          16:30:46
the bottom that was sent on January 19th?  Inova
896, the last page of Exhibit 20.

A    Yeah.  But it actually was sent at 4:48.         16:31:11

Q    On January 19th, on Friday, right?              16:31:16

A    Okay.  All right.                               16:31:23

Q    All right.  And then, you were jumping          16:31:25
ahead a little bit.  You went on 894, Inova 894,
to your e-mail of January 31st, 2024, the one you
were just reading where you wrote, I can attend a
meeting tomorrow or on Friday at 4:30 p.m. or
Monday at 4:30 p.m.; correct?  But you will need
to send the link again.  Do you see that?

A    Yes.                                            16:31:59

Q    So you're proposing tomorrow, Friday, at        16:32:00
4:30 or Monday at 4:30, right?

A    Right.                                           16:32:08

Q    At the top of -- above your e-mail,             16:32:15
Ms. Fulwood writes you again on February 1st, that
she will be sending an evite for the rescheduled

meeting after this e-mail, and that invite will include the meeting link; correct?

A    That's what it says.                            16:32:39

Q    And you thank her in response, right?          16:32:42
Above her e-mail, do you see where you thank her, acknowledging that you received it?

A    Okay.                                           16:33:01

Q    All right.  Now look at the first page,        16:33:03
which is Inova 882.  Do you recognize this as another Microsoft Teams invite, now setting the meeting for Monday, February 5th, at 4:30 p.m.?

A    Okay.                                           16:33:23

Q    And that was one of the times you had          16:33:25
proposed; correct?

A    Yes.                                            16:33:29

Q    Do you recall why you didn't attend that       16:33:32
meeting?

A    I was in a case in surgery.  I was in a        16:33:38
case, and I didn't get relieved on time.

Q    During your assignment at Inova                16:33:50
Alexandria Hospital, do you recall Ms. Meshach or Ms. Lowry addressing any performance concerns or

conduct concerns with you during that assignment?          16:36:06

A    Yes, I do.                                            16:34:07

Q    What do you recall?                                   16:34:10

A    Them calling me.  Well, it was Dana and              16:34:13
-- my manager, Dana, and Robin called me into the
office and said that I was being very mean and
aggressive to people and stuff.  And I was like,
What do you mean?  What are you talking about?
And they were like, Oh, maybe it's your tone of
voice.  And I was like, I don't know what you mean
by that, but okay.  I was like, How I talk is how
I talk.  I don't know exactly what you mean by
that.  And they was like, Well, you know, it's
like sometimes I -- they said I was calling people
by hey girl, hey this.  And I was like, No, I
don't talk to anybody like that.  I was like, No.
I would say excuse me.  It was like, Well we --
and they said -- Oh, well, we prefer you to call
people by their name.  And I said, Well, because
of the medication and my condition, it's hard for
me to remember names sometimes.  So I would just
say excuse me, or I'm not being derogatory to

anyone.  If I can't remember your name, it's
because of my issue, my disability, because I'm
having a hard time with that.

Q    Where did this meeting take place?          16:36:03

A    In the conference room.                      16:36:06

Q    At?                                          16:36:10

A    At Inova Alexandria yes.                     16:36:10

Q    And Ms. Meshach and Ms. Lowry.  Was         16:36:15
there anyone else present?

A    No.                                          16:36:22

Q    Had you had any discussions prior to        16:36:24
that meeting with Ms. Meshach or any RN nursing
supervisor with her?

A    The one, maybe, probably with Chris         16:36:41
Chira at one point.  She pulled me into the
office.  I can't remember the exact incident, what
it was for, but she called me into the office, and
then she was asking me questions.  And I was
answering them truthfully and explaining myself.
And then, Robin looked at me and was like, Are you
okay; are you having an incident right now?  And I
didn't know what to say to her because, I mean,

once she knew about my disability, I didn't know                16:39:13

what you meant by that answer.  So -- and Chris

the other -- he was the charge nurse.  He was

like -- he even said.  He was like, What are you

talking about?  Dee Dee always talks like that.

She's not being -- he was like, She's not doing

anything; she's always talks like that.

Q    What did Robin know about your                            16:38:02

disability at the time of this meeting?

     MR. STRELKA:  Objection.  Speculation.                    16:38:09

Answer if you can.

Q    Let me rephrase.  Had you shared                          16:38:16

anything about your disability with Robin prior to

that meeting?

A    Yeah.  Just the schedule change, that I                   16:38:26

wanted to get the schedule to change.

Q    What did you share with her?                              16:38:33

A    That I had a disability now, and I                        16:38:36

realize it now, and that I'm working through it

and trying to understand it.

Q    Did you receive a verbal warning in the                   16:38:49

meeting you were describing in which Ms. Lowry and

Ms. Meshach were present?

A    Yes.  Because they told me it was my
tone of voice.  That's what it was for.

Q    Look at Exhibit 21.

(Exhibit 21 was marked for
identification attached to the transcript.)

Q    Do you recognize this as an e-mail you
received from Dana Lowry?  It's dated
January 30th, 2024 and references an attachment
called Daniels, D., professionalism, verbal,
January 19th, 2024?

A    Yes.

Q    And is the attachment here at Inova 860
a copy of the verbal warning that you received?

A    Yes.  The verbal, yes.

Q    Do you know if, by the time you received
this, your assignment at Inova Alexandria was
ending?

A    No.  It wasn't ending.

Q    How much longer do you recall still
working at Inova Alexandria after receiving the
verbal warning?

A    Like, four more weeks.  Four more weeks, 16:40:56
or maybe a month more.  I don't know.  Whatever
time I was there.  I mean, whatever time I was
scheduled to be there.  But I still had probably,
like, a couple weeks or so, because I don't think
it was ending that time soon.

Q    Do you think that was a couple weeks 16:41:19
left after the first conversation with Ms. Meshach
and Chris or after the verbal warning was issued?

A    Repeat that question. 16:41:32

Q    Do you mean there were a couple weeks 16:41:35
left after your first conversation with
Ms. Meshach and Chris or after the verbal warning?

A    I don't remember which one happened 16:41:46
first.  But I believe the meeting with Chris
happened first, and it kind of took me for a loop.
But then I think the verbal came second.  This one
came second, I believe, yes.  Yes.

Q    Look at Exhibit 22. 16:42:08

(Exhibit 22 was marked for 16:42:10
identification and attached to the transcript.)

Q    Do you recognize this as an e-mail, 16:42:16

dated December 14th, 2023, from Ms. Fulwood to several recipients that reflects that your next contract would start January 28th, 2024 through April 27th, 2024 at Inova Fairfax Hospital PSB Surgery Center?

A    Yes.                                           16:42:49

Q    Okay.  What is the PSB Surgery Center?         16:42:51

A    It's another OR unit within the Fairfax        16:42:57
Tower.  But they have three different sections. They have the towers, the main, for trauma and all the bigger cases.  And then they have the women's unit, which is just women's procedures.  And then this third one was, like, maybe, like, minor procedures, I would say, kind of minor.

Q    Who was your manager at the PSB Surgery        16:43:31
Center on site?

A    Maybe Crystal, I think it was, possibly.       16:43:36

Q    Crystal Corfman?                               16:43:41

A    Yes.  That sounds right, yes.                  16:43:42

Q    Do you recall Ms. Corfman, or anyone           16:43:46
else in the PSB Surgery Center, addressing any performance conduct concerns while you were on

that assignment?                                    16:45:44

A    No.  Not that I recall, no.                     16:44:03

Q    Do you recall that you worked eight-hour         16:44:06
shifts when you were working at the PSB Surgery
Center?

A    Yes.  I took them with me, yes.  I took          16:44:23
that on with me all the time, my FMLA paperwork,
yeah.  But I think that's what they worked
anyways, was eight-hour shifts.

Q    Okay.  That unit assigned you for               16:44:45
eight-hour shifts from the outset?

A    Yes.  Yes.                                       16:44:52

Q    And those eight-hour shifts, they were          16:44:53
five days a week?

A    Yes.                                             16:44:57

Q    And what were the typical hours?                16:44:59

A    7:00 to 3:30 around, about that time.           16:45:02
Maybe a little bit later.  Maybe to 4:00.

Q    And that was your normal schedule?              16:45:11

A    Yes.  From what I gather, yes.  Yes.            16:45:15

Q    All right.  Can you look at Exhibit 23?        16:45:17

     (Exhibit 23 was marked for                     16:45:22

identification and attached to the transcript.)

Q    Do you recognize this as an e-mail that          16:45:30
you sent to Ms. Farrah, dated February 28th, 2024?

A    Yes.          16:45:43

Q    Okay.  And in this e-mail, it appears          16:45:44
you're seeking permission to park in the blue
garage due to your condition; correct?

A    Yes.          16:45:56

Q    That blue garage is on the Inova Fairfax          16:45:58
medical campus?

A    It is.  It is.          16:46:04

Q    And where had you been parking, if not          16:46:07
in the blue garage?  Where was your designated
parking area?

A    The designated parking area was way          16:46:18
father.  Like, from maybe this building over to
the old other building, a little bit further,
maybe.  It was very far.

Q    Do you recall how long it would take          16:46:35
someone to walk between the designated parking
garage for employees and the PSB area?

A    At least five to six minutes, possibly.          16:46:50

Sometimes maybe longer.  I don't know.    16:48:48

Q    And how long would it take you to walk    16:46:58
from the blue garage to the PSB?

A    Maybe -- I take that back.  It was    16:47:04
longer.  Maybe, like, eight minutes, I would say,
from that one, due to my disability.  But from the
other one, maybe, like, four or five minutes,
because it was a direct connect to the actual
building.  It was a direct connect.

Q    Okay.  And if you were parking in the    16:47:31
designated employee one, could you get to the PSB
by walking through other parts of the hospital?

A    No.  Well, no, because that one was kind    16:47:45
of like a disconnected one.  That one that they
assigned to everybody, it was a designated one,
and I didn't have -- I'd tell them, like -- I
wanted to pay.  I was willing to pay for the
parking, if I could just park closer and not have
to walk in the cold, because it was cold during
that time.  And I was in so much pain, and I
didn't think I could walk from that far one all
the way outside to get to the other unit that I

Q    And how had they partially accommodated     16:53:04

you?

A    Because I was getting the eight-hour     16:53:09

shifts at the moment, yes.

Q    And you don't mention anywhere in this     16:53:15

charge being denied a closer parking space, do

you?

A    I never really got it.  I had to do it     16:53:28

myself.  I went and discussed it with the security

officer, so they wouldn't tow my car.

Q    And were you allowed to in the blue     16:54:17

garage?

A    Yes.  They needed to actually change it,     16:54:21

like, closer to -- I don't know if it was, like,

after I had the meeting with the manager.  He

changed it because I asked him, and I showed him

my documentation of, like, it's hard for me to

even get out of the car sometimes.  Like, it's

hard.  And he was like -- and I said, I'll pay.  I

just don't want you guys to tow my car.  That's

all I'm asking.  And I begged.  And so I'm asking,

it's only -- and he said, That's fine.  And he

gave me the parking permit.

Q   Okay.  So you were given the parking                16:55:08

permit for the requested garage?

A   Yes.  But not from HR.  They never                   16:55:16

addressed me.  They never replied back.  So I went

over there myself, because it was either me not go

to work or me park there and risk my car getting

towed.

Q   From HR you never received a grant or a              16:55:40

denial; is that right?

A   Yeah.  They never answered me at all.                16:55:46

Q   Okay.  But security was able to allow                16:55:50

you to park there?

A   Yes.  Because I went, and I talked to                16:55:56

them myself.

Q   Okay.  And you didn't include that in                16:56:00

your charge any denial of that parking; correct?

A   Not there.                                           16:56:11

Q   Okay.  Let's go to Exhibit 25.                       16:56:13

    (Exhibit 25 was marked for                           16:56:15

identification and attached to the transcript.)

Q   Do you recognize this as a copy of                   16:56:22

medical records you produced in discovery from a
March 18th, 2024 visit with Dr. Dave?

A    Yes.                                         16:56:36

Q    Would this have been your next               16:56:38
appointment after the December 18th, 2023
appointment?

A    I guess, yes.  It looks like it.             16:56:52

Q    All right.  If you could look at Daniels     16:56:55
medical records 323, which is also Page 199.

A    Okay.                                        16:57:12

Q    Under the HPI section completed by           16:57:14
Dr. Dave, do you see the section that starts,
Ambulation distance, support, and falls?

A    Yeah.                                        16:57:31

Q    And at this time, you're reporting           16:57:33
slight imbalance, but no falls, and you could walk
one mile; is that right?

A    Up to one mile, yeah.  I mean,               16:57:43
intermittently, but not all at the same time, no.

Q    Does it say that on here?                    16:57:51

A    I don't know why he didn't put it.           16:57:54

Q    Were you able to receive a handicap          16:57:58

placard at this time?

A    I requested one.                                    16:58:03

Q    But were you entitled to one?                       16:58:05

     MR. STRELKA:  Objection.  Speculation.              16:58:09
Answer if you can.

Q    I'll rephrase.  Were you granted one at             16:58:15
this time in March of 2024?

A    No.                                                 16:58:26

Q    Sorry.  Was that no?                                16:58:29

A    No.  Sorry.                                         16:58:32

Q    Just remember.  Because you are shaking             16:58:34
your head, so I get it.

A    Sorry.                                              16:58:43

Q    We can look at the next page, which is              16:58:43
Daniels medical records 324.  Do you see the part
right above imaging that says gait, and he writes,
Normal uni-lat toes, stands good, tandems well;
correct?

A    Yes.                                                16:59:18

Q    On the next page, Daniels medical record            16:59:20
325, it says, Plan to return in two months or
around May 18th, 2024?

A    Yes.                                        16:59:34

Q    Do you recall any visit in between those   16:59:36
two appointments?

A    No.  Not that I remember, no.  Not with    16:59:42
him.  Not with him.

MS. KIRKLAND:  Off the record just for a        16:59:53
second.

COURT REPORTER:  All right.  One moment,        16:59:56
please.  We're going off the record.

(Whereupon, a recess was taken.)               17:00:01

COURT REPORTER:  We are back on the            17:00:07
record.

BY MS. KIRKLAND:                               17:00:09

Q    Okay.  Look at Exhibit 26, which is        17:00:11
Inova 990.

(Exhibit 26 was marked for                     17:00:16
identification and attached to the transcript.)

Q    Do you recognize this as an e-mail from    17:00:24
Trisa Fulwood, dated March 12, 2024, to Ashley
Smith, Jamie Addo, Dana Lowry, there's a Kelly
Sponaugle, and you, advising of an assignment for
you back at Inova Fairfax Hospital Tower OR?

A    Yes.                                                    17:00:51

Q    Okay.  And that would be from                          17:00:53
April 28th, 2024 to August 10th, 2024; correct?

A    Yes.                                                    17:01:01

Q    This is the same unit and OR part that                 17:01:03
you had been at the prior summer; correct?

A    Yes.  Yes.                                              17:01:11

Q    Okay.  All right.  Let's go to Exhibit                 17:01:13
27, which is Inova 1351 to 1356.

     (Exhibit 27 was marked for                             17:01:25
identification and attached to the transcript.)

Q    Do you recognize this bottom e-mail as                 17:01:32
one you sent, dated April 29th, 2024 to Katelyn
Dann, Carman Hsu, H-S-U, and Mary Robinson and
then Leesa, her last name is spelled K-T-Y-T-O-R?

A    Yes.                                                    17:01:55

Q    Okay.  Who are these people that you're                17:01:57
sending this e-mail to?

A    They were the -- I guess you would call                17:02:03
them the people who did the schedule.

Q    Did the schedule for the Tower OR from                 17:02:11
the hospital?

A    Yes.  Yes.                                      17:02:19

Q    Okay.  And you write that you have a           17:02:22
doctor's note request that you could only work
eight-hour shifts due to your severe and
progressive form of multiple sclerosis; correct?

A    Correct.                                        17:02:37

Q    What prompted you to send this e-mail?          17:02:38

A    Because sometimes, when I would come to        17:10:24
work, I would see my name -- we had magnets.  And
your magnet had a name on it, and either it was
blue or green.  I can't remember which color was
which, 100 percent, but one meant 12-hour, one
meant eight-hour.  And sometimes, when I would
come in, my name would be for a 12-hour shift, and
it would be in blue.  And I'm like, You guys, I
can't work a 12-hour shift.  And I would show
them.  I'm like, Okay, I can't work a 12-hour
shift; can you please change that?  And then they
would say, Oh, we have to talk to somebody, and
then they would change it.  And I was like, I
can't stay beyond eight hours.

Q    Is this just the first or second day of        17:11:29

your assignment back at the Tower OR?  You can
look back at Exhibit 26.

A    Yeah, let's see.  I started on the 28th,          17:11:48
yes.  It had to be, yeah.

Q    And you had written, you observed your           17:11:55
new schedule today in Smart Square.  How far out
did those schedules typically go?

A    Usually, six weeks, I think.  I'm not            17:12:06
100 percent, but I think it's usually six weeks,
six to eight weeks.

Q    Okay.  So when you arrived at Inova              17:12:16
Fairfax Hospital back to Tower OR, does this
e-mail suggest, when you logged in and saw your
schedule, you were working -- you were scheduled
to work 12-hour shifts?

A    Two twelves, two eights.                         17:12:36

Q    Okay.  The same schedule that you had            17:12:39
had originally the prior summer until it changed?

A    Correct.                                          17:12:48

Q    Understood.  Okay.  And then you -- it           17:12:49
looks like there's attachments to this e-mail,
August 24th to yourself.  Do you see this

paperwork attached at Inova 1352 to 1356?

A    Yes.                                    17:13:14

Q    Okay.  And this is the paperwork you're    17:13:16
referring to, where you can only work eight-hour
shifts, right?

A    Yes.                                    17:13:24

Q    Okay.  On 1353, does this reflect -- is    17:13:25
this Dr. Dave's signature?

A    This is him filling out this paperwork,    17:13:37
because he said this was the paperwork that he
remembers to get my accommodations.

Q    Right.  This is the paperwork that    17:13:50
Ms. Farrah had provided you that says medical
certification part; correct?

A    I don't remember her preparing it.  She    17:14:01
didn't give me this.  I don't remember her
providing this, no.  He gave me this.

Q    If you look back at Exhibit 15 --    17:14:14

A    15?                                    17:14:19

Q    Uh-huh.                               17:14:24

A    Okay.  All right.  15.                17:14:28

Q    This is the paperwork Ms. Farrah sent    17:14:32

you December 21st, 2023?                        17:16:24

A    Right.  Exactly.                           17:14:39

Q    Can you compare Inova 583, that first      17:14:43
attachment called medical certification
questionnaire, with Inova 1354, the medical
certification questionnaire attached to your
e-mail?  Is this the form Ms. Rivera had sent you,
comparing Inova 583 to Inova 1354 in Exhibit 27?
I think don't think you're at it.  You're looking
at 583.

A    Oh, this one?                              17:15:24

Q    Yes.                                       17:15:27

A    This is the one she provided with me,      17:15:28
yes.  Yes, ma'am.

Q    And that is filled out by Dr. Dave at      17:15:34
Inova 1354; correct?

A    Where's 1354?                              17:15:46

Q    In Exhibit 27, look at the next page,      17:15:51
1354.

A    Okay.  Yes.  He filled out both.          17:16:03

Q    Okay.  And this one he filled out and      17:16:07
signed on January 16th, 2024; correct?

A    Yes.

Q    Okay.  And this is the paperwork in which he --

A    He did both, yes.

Q    He did one for federal family medical leave and one for accommodations; correct?

A    Well, he did it for both, because they kept telling me that they wanted this one filled out, and he kept telling me that was the wrong paperwork, that he knows that's not the right correct paperwork to fill out for my ADA intermittent leave for multiple sclerosis [sic].

Q    He filled out both of these sets, 1352 and 1354, both together on January 16th, 2024; correct?

A    Something like that.  But I can look at this to make sure.  Okay, yes.

Q    Okay.  Can you go back to Exhibit 16 for a minute?

A    16, okay.

Q    That paperwork that we were just looking at, dated January 16th, 2024, was not what you

provided to Ms. Farrah and Ms. Lowry on                 17:19:41

January 7th, 2024; correct?

A    No.  Because I only provided them with            17:18:02

what my doctor was saying.  No.  I didn't have the

paperwork.  I didn't -- I don't remember them

giving me the paperwork.  I mean, you said they

gave it to me, but I don't remember.

Q    Okay.                                             17:18:27

A    I mean, I gave him the paperwork they             17:18:29

told me to give him.  And he said, That's not the

correct paperwork.  So --

Q    But going back to Exhibit 27, he did              17:18:38

fill out two sets of paperwork?

A    He did.  He did, because I told him,             17:18:45

This is the one they wanted you to fill out, and

then you fill out the one that you think is

correct.  And that's what he did.

Q    And if you look at that paperwork, Inova          17:18:58

1352, has at the top, Leave Claim Number.  Do you

see that?  Do you know if that relates to your

leave claim with the Hartford?

A    Which one?  Which date are you talking            17:19:23

A    Okay.                                          17:23:25

Q    I want to start with the middle e-mail         17:23:27
from Ms. Lowry.  Do you see that second e-mail on
this page from Ms. Lowry, dated April 29th, 2024
at 3:46 p.m.?

A    Uh-huh.                                         17:23:47

Q    And she writes, We received a call from        17:23:48
Ashley from Tower OR regarding your scheduled
eight-hour shifts.  Your request for
accommodations, eight-hour shifts are attached.
And then she writes, We tried to meet with you in
January multiple times to review your request.
Please give us time when you are able to meet to
discuss your accommodation request; correct?  And
that's referring to those meetings we discussed
earlier, where they were set, but you weren't able
to attend; is that right, the multiple times in
January?

A    Yeah.  The ones in January, yes.               17:24:37

Q    Okay.  And you respond -- you don't            17:24:40
dispute that you didn't attend those meetings;
correct?

A     I couldn't.                                          17:24:51

Q     And you provide five different dates                17:24:54
that you could meet at either 4:00 p.m. or
4:15 p.m.; correct?

A     Yes, correct.                                       17:25:04

Q     Okay.  All right.  Let's go to                      17:25:05
Exhibit 30.

      (Exhibit 30 was marked for                          17:25:09
identification and attached to the transcript.)

Q     Do you recognize this as a Microsoft                17:25:15
Teams invite for Monday, May 6th at 4:00 p.m.,
organized by Ms. Lowry and sent with required
attendees of Ms. Lowry, Ms. Farrah, and you?

A     Okay.                                               17:25:44

Q     And May 6th at 4:00 p.m. was one of the             17:25:46
dates and times you provided; correct?

A     Yes.                                                17:25:52

Q     Do you know if you attended this                    17:25:54
meeting?

A     I'm not for certain, because I don't                17:25:58
know which date they chose.

Q     This invite reflects it's set for May               17:26:11

after that phone call or Teams meeting?                17:30:59

A      I don't know.                                    17:29:25

Q      You don't know one way or the other?            17:29:26

A      No.  I don't know.                               17:29:29

Q      Do you recall that Inova Fairfax                 17:29:31
Hospital Tower OR did accommodate you with
eight-hour shifts after this?

A      No.  Not really, because every day -- I         17:29:43
mean, some days when I would come in -- I'm not
saying every day, but it was a majority of the
days.  Sometimes whoever was making the
assignments on the board, they would put me in for
12 hours.  And I was like, You guys, I can't work
12 hours.  Like, I hate to bring this up again,
but I had it with me all the time, because I was,
like, I might as well just carry it with me
because I don't know any other way that you guys,
you know, are going to enforce it.  So I would
just keep reminding them and keep reminding them.
I didn't know any other way around it.

Q      For each of your shifts at Inova Fairfax         17:30:39
Hospital, you clock in and out; correct?

A    Correct.                                          17:30:47

Q    Do you have any reason to believe a              17:30:50
report of your time generated from that system
would not be accurate?

A    If they asked me -- some days they'll            17:30:59
call me in early.  Like, if I know -- I would know
the date before, or they would text me and say,
Hey, your case is starting early; we need you to
be here at this time; come in early.  And I would
have to report those days to my managers and say,
Hey, look, it may reflect differently to you
because they asked me to come in early, and they
told me -- they would tell me, Oh, well, if they
ever ask you to do that, just send us an e-mail
and say, Hey, they asked me to come in early
today.  That's why I clocked-in this time.  But
other than that, no lateness.

Q    Right.  My question was, the system -- a         17:31:53
report generated from the system reflecting your
clock-in and out that, times --

A    Right.  Most definitely.  It should,             17:32:11
yes, ma'am.  But if I was asked to come in early,

Q    My question is not whether she answered                    17:46:39
you.  I'm asking whether you have any knowledge
sitting here today of where you sent this?
A    I know I sent it to HR, and somebody in                    17:46:55
HR.
Q    As of the date of this letter, were you                    17:47:02
aware that Inova Fairfax Hospital Tower OR had
already apprised Ms. Lowry they could accommodate
your eight-hour shifts?
A    Yes.  And I told her, I understand that,                   17:47:21
but every -- sometimes when I go in, they're still
scheduling me to do twelves.
Q    Were you ever required to work 12 hours                    17:47:39
at Inova Fairfax Hospital Tower OR after May of
2024?  Or after, I guess, starting with this
assignment in April of 2024, were you ever
required to work a 12-hour shift at Inova Fairfax
hospital Tower OR?
A    No.  Because I didn't want to risk                         17:48:09
myself or a patient, for that matter.
Q    Let's look at Exhibit 32.                                  17:48:19
     (Exhibit 32 was marked for                                17:48:21

identification and attached to transcript.)

Q    Do you recognize the bottom e-mail as an                17:48:38
e-mail from Kate Theissen, dated July 15th, 2024
to you, and there's recipient cc'ed, reflecting
that you would be assigned, beginning August 11th,
2024 to November 9, 2024 at Inova Loudon
Hospital's OR?

A    Yes.  I do remember.                                    17:49:13

Q    Okay.  This time it is sent by Kate                     17:49:16
Theissen or Katherine Theissen.  Was there a point
in time in which your supervisor in the Inova
Staffing Solutions department changed from
Ms. Lowry to Ms. Theissen?

A    From my understanding, I thought they                   17:49:39
were both, at one point, my managers, because the
third one had joined in.  Kate, Katherine
Theissen, she was the last addition to the
management team.

Q    Do you recall when that was?                            17:50:02

A    No.  Not exactly, no.                                   17:50:07

Q    Was there some point in time when                       17:50:11
Ms. Lowry left Inova?

A    I think at some point, but I'm not for sure exactly when she exited, no.  Not for sure.    17:50:19

Q    All right.  In the e-mail above that one, do you see an e-mail from Shelby Howell, dated July 15th, 2024, in which she writes, Dee Dee, we plan for you to work Monday to Friday, 7:00 to 15:30.  We will add you to the call schedule after you get settled.  Do you see that e-mail?    18:00:58

A    Yes.    18:01:32

Q    And so, the same day you learned of your assignment, you also learned that you would work five eight-hour shifts at Inova Loudon's OR; correct?    18:01:34

A    Correct.    18:01:49

Q    And you replied, Great, thank you so much; correct, at the top?    18:01:50

A    Where is my reply?    18:01:58

Q    The very top.    18:02:01

A    Oh, yes.  Yes.    18:02:02

Q    Okay.  And you don't express any concerns with that schedule, right, the five eight    18:02:04

hours?

A    No.                                            18:02:13

Q    Okay.  At Inova Loudon in the OR, did          18:02:14
Ms. Howell ever speak with you regarding any
concerns with your performance or behavior?

A    No.  None at all.  I mean, the last day.       18:02:35
But other than that, no.

Q    You only recall one discussion with           18:02:45
Ms. Howell on your last day?

A    One discussion with her.                       18:02:52

Q    And when you say last day, that wasn't         18:02:56
the last day of your assignment; correct?

A    Yes, it was.                                   18:03:05

Q    Let me rephrase.  Was that the last day        18:03:08
of your scheduled assignment?  Meaning
November 9th, 2024, or was it some date earlier?

A    No.  It was the day she dismissed me on        18:03:22
like September, something.  September 17th, I
think.  It was September.

Q    And what did she say when she dismissed        18:03:36
you?

A    She brought me into the office, and she        18:03:39

said that she's been having complaints about me.
Some of the staff saying that they can't approach
me, they can't talk to me.  And I was like, Why?
What?  What have I done?  Who?  What am I saying
to anybody?  And she was like, Well, I don't know.
Every time I talk to you, you're very pleasant,
you're friendly.  I don't know why anybody can't
talk to you.  And I was like, Well, why would
anyone feel that way?  I've been doing nothing but
trying to be the best help I can be here, in every
which way you need me to be.

And she was like, Well, I don't know.  I                18:04:36
have a certain culture here, and you just don't
fit in.  And I said, Well, what kind of culture is
that?  And she was like, Well, it's just a certain
type of culture, and you just don't fit in.  And I
was like, Well, what am I doing?  What can I do to
improve?  What am I doing?  And she was like,
Well, I'm just going to assign you.  I just told
your managers to have you assigned somewhere else.
I don't think it's a good fit.  And then she asked
me -- she said, I'm not going to call the security

on you.  And I said, Do you feel that's necessary?  18:07:12
Like, What did I do?  Am I being a threat to
somebody?  What did I do?

Sorry.  Sorry.  I just wanted her to  18:05:37
explain to me what I was doing and why she thought
there was a need to call security on me to escort
me out.  And then, she was like, Well, I'm not
going to call them.  It's okay.  Just give me your
badge, and I'll escort you out.  So she took me to
the locker room.  She walked me.  She saw me clean
out my locker.  And then, she just walked me out
the door.

Q   During that discussion, did she make any  18:06:22
statements about your placement on administrative
leave?

A   She said, Maybe you'll be paid.  And she  18:06:32
was like -- she was like, I don't know, maybe
you'll be paid.  And I was like, Okay.  I didn't
want to argue, because I didn't want to be
arrested for something.  I didn't know what I did
to anybody.

Q   Was anyone else present for that  18:06:55

A    No, nothing else.  I mean, my memory was    18:09:54
sometimes not the best, but I know, you know, he
would ask me, but I don't remember anything at
work going bad or anything.  Like, nobody
complaining about me or me causing any trouble.
So, I mean, the stress was maybe internally,
possibly, like, in my head, maybe.

Q    The next line, it actually states that    18:10:33
your memory is overall okay; correct, at that
time?

A    Okay.  But not the best.    18:10:41

Q    Okay.    18:10:44

A    Not what I'm used to.    18:10:45

Q    Understood.  And then, the next line    18:10:47
says, Maximum work, eight hours a day and has been
able to do so?

A    Yes.  Yes.    18:10:59

Q    So you hadn't had any issues working the    18:11:00
eight-hour-a-day shift you had at Inova Loudon?

A    No.  No.    18:11:09

Q    Flip two pages over, 390.    18:11:13

A    390 on here, okay.    18:11:19

Q    390 or 206.  It's just two pages over.    18:11:24

A    Oh, sorry.  Sorry.    18:11:30

Q    I know there's two numbers on each.    18:11:34

A    Okay.  All right.  206, okay.    18:11:38

Q    All right.  Under Assessment Plan, you'll see it looks like you were to return in about two months or around December 1st, 2024; is that correct?    18:11:42

A    Oh, to Dr. Dave.  That's what you're asking me, yes.    18:12:00

Q    Sorry.    18:12:05

A    Yes.    18:12:07

Q    Okay.  So would that have been your next appointment with Dr. Dave?    18:12:07

A    Yes.  Because I would see him every three months.    18:12:13

Q    Okay.  And then, there's four numbers. And under that, do you see the sentence that starts, 37-year-old female with MS?    18:12:17

A    Yes.  Yes.    18:12:32

Q    Okay.  And that next sentence states, Does not qualify for a handicap placard, given    18:12:34

that she can walk greater than 200 feet.  Is that          18:14:34

something you had tried to apply for at this

point?

A    I tried, because I was at -- this                     18:12:56

facility didn't have a garage.  So I would have to

park outside, and it was cold.  So I don't know.

What is this?  When was this, September?  So it

may have still been cold, chilly.  And I would be

in pain, because I would have to get in and out of

my car, in and out of my car, and I couldn't.  Or

I had to walk in the rain, and I noticed -- I

noticed that I would have to watch my feet in

order to make sure I stayed and didn't trip on

something.  So that's why I wanted to ask him for,

maybe, a handicap parking space so I could park a

little closer to the door.

Q    But I guess you didn't qualify at that                18:13:58

point?

A    He said no.  He said no.                              18:14:03

Q    And by the time of this appointment, you              18:14:11

were already on administrative leave, right?

A    I was still on administrative leave,                  18:14:21

would try to.  And, I mean, for the last four weeks, even at Alexandria, I was just being quiet, because I was so scared that I would get reported again for something.  So --

Q    Under previous discipline, there is reference to the IAH leadership team coaching on December 20th, 2023.  Do you know if that refers to that conversation with Ms. Meshach?                18:28:24

A    Robin.  I think it was with Robin and with Dana that day.                18:28:43

Q    Okay.  And then, that's also when you received the verbal warning; correct?                18:28:49

A    That was just a verbal, yeah.  I only had a verbal that day, I only had.                18:28:55

Q    The third bullet point said PSB leadership team coaching --                18:29:03

A    Oh, maybe that's what it was.  Okay. I'm sorry.  You're saying -- wait a minute. Rephrase that first question.                18:29:12

Q    Sure.  The top bullet point, IAH leadership coaching on December 20th, would that have been the meeting with -- I think it was, you                18:29:23

said, Robin and Chris?

A    Yes.  That would have been probably been the meeting with Robin and Chris, yes.                    18:29:39

Q    And then the verbal warning would have been with Robin and Dana Lowry; correct?                    18:29:45

A    Yes.  Yes.  Yes.  Yes.                    18:29:54

Q    Do you know what is referenced here with PSB leadership team coaching on March 12th, 2024?                    18:29:57

A    I remember asking -- I've never gone in Crystal's office.  And somebody was asking me to ask her if it was okay for me to get the parking.  So I want to say, maybe, that was that meeting for that.  And she said there was nothing she could do about it.  And that's when she told me to reach out to HR.                    18:30:07

Q    Okay.  But otherwise, you don't know what that references specifically?                    18:30:38

A    No.                    18:30:45

Q    All right.  Let's look at 35.                    18:30:48

     (Exhibit 35 was marked for identification and attached to the transcript.)                    18:30:50

Q    Let me start with the bottom e-mail.  Do                    18:30:57

now been 28 days.  Is that 28 days since you were
placed on -- since you were dismissed from the
manager at Loudoun?

A    Yes.  September 17th was that day.                    18:39:12

Q    Okay.  In the next paragraph you write,              18:39:15
at the very bottom, that this led you to be placed
on unpaid admin leave after initially being
informed it would be paid administrative leave.
Earlier, you testified today that Shelby Howell
told you she didn't know if it would be paid;
maybe it would be paid.  Is that who you're -- is
that the conversation you're referring to here?

A    Yes.                                                  18:39:52

Q    Okay.  In the e-mail above, less than                18:39:54
three days later, you forward that e-mail to
Dr. Jones correct?

A    Was it the 15th?  I did meet him on                   18:40:09
October 15th.  And then the 18th to him, right?

Q    October 15th at 5:42 p.m. to Mr. Pratt,              18:40:23
and then, October 18th at 1:31 p.m. to Dr. Jones;
correct?

A    Okay.  It that three days or two days                18:40:37

to accommodate your eight-hour shifts before you
went to Loudoun, right?                                    19:18:27
A    Yes.                                                  19:18:29
Q    Okay.  Do you know what had created
their need for a float nurse?
A    I'm guessing because they were usually                19:18:36
the ones was always short.  They were the busiest.
Q    That's just a guess, though?  You don't               19:18:45
have any knowledge?
A    Just a guess.  I don't have any                        19:18:49
knowledge.
Q    All right.  Let's look at 37.                          19:18:55
     (Exhibit 37 was marked for                            19:18:57
identification and attached to the transcript.)
Q    Do you recognize this?  It's Inova 1848.              19:19:04
It's an e-mail forwarded to you from Kate Theissen
on October 23rd, 2024, that was welcoming you back
to the Tower OR?
A    Yes.  But it wasn't -- yeah.  But it                  19:19:26
looks like it was sent to the Hotmail, and I'm not
sure if I even ever got that one.  They didn't
call me.

Q    And that's why Kate is now forwarding it
to your Gmail the next day; is that right?          19:19:40

A    Yes.  Yes.          19:19:48

Q    Okay.  Tower OR's prior e-mail for you
would have been the Hotmail one, right?          19:19:50

A    Yeah.  That was the only one they had.          19:19:59

Q    All right.  Let's go to 38.          19:20:02

     (Exhibit 38 was marked for          19:20:05
identification and attached to the transcript.)

Q    Do you recognize this as an e-mail you
received on October 22nd, 2024, from Jeffrey
Pratt?          19:20:11

A    Yes.          19:20:27

Q    In less than one week, he is responding
to your October 15th, 2024 e-mail; correct?          19:20:28

A    Yes, he is.          19:20:38

Q    And he confirms that, from
September 17th to September 28th, you will receive
pay for paid admin leave during that time;
correct?          19:20:41

A    Correct.          19:20:55

Q    And you did receive that pay; correct?          19:20:57

A    I guess, yes.                                    19:21:02

Q    Okay.  Starting September 30th, your            19:21:03
leave would be unpaid; correct?

A    Yes.                                             19:21:11

Q    And that's what your final written              19:21:13
warning had said as well; correct?  If you want to
look back at it, if you don't remember, it's
Exhibit 34.  In the second page of Exhibit 34, the
final written warning at Inova 1683, do you see in
that paragraph above Previous Discipline, that you
will be placed on unpaid administrative leave
until they can locate an OR at a hospital willing
to accept you for an assignment?

A    Yes.                                             19:21:57

Q    Okay.  And as of October 22nd, 2024,            19:21:58
when Mr. Pratt is responding, you have an
assignment beginning the next day at Inova Fairfax
Tower OR; correct?

A    Yes.                                             19:22:18

Q    Okay.  He writes in his e-mail that             19:22:22
finding an assignment through ISS has been
challenging, but cannot conclude that's related to

anything other than legitimate and

nondiscriminatory performance concerns.

    Do you have any evidence that that                    19:22:43

wasn't his finding?

A    No, I don't.                                         19:22:48

Q    Let's look at 39.                                    19:22:52

    (Exhibit 39 was marked for                            19:22:53

identification and attached to the transcript.)

Q    This is Inova 1905.  Do you recognize                19:23:01

this as an e-mail from Katherine Theissen, dated

January 14th, 2025, advising that you would be

extended to April 26th, 2025 at Tower OR?

A    When was this, January 14th?                         19:23:28

Q    Uh-huh.                                              19:23:32

A    I don't remember seeing that e-mail.  I              19:23:36

don't remember.  Uh-uh, because they had Kate and

sometimes -- I don't know if she was still there.

Dana would give me last-minute warnings, like,

last-minute, I mean.  And I don't know which

e-mail they sent it to.  If they sent it to the

Hotmail, of course, I didn't get it.

Q    But you also received e-mail at Inova;              19:24:11

correct?  You were still working at Inova in
January 2025?

A    Yes.  But not all the time could I be
available to check it.  Like, I tried my best, but
not all the time can I actually check it, if I am
busy in a case.                                          19:24:22

Q    So are you just learning today that, in
January of 2025, your contract had been extended
to April 26th, 2025 in the Tower OR?                     19:24:38

A    No.  They didn't tell me that.  I don't
remember.                                               19:24:54

Q    Well, no.                                          19:24:58

A    Oh, did I recognize it?  No.  This is my
first time, yes.                                        19:25:01

Q    Okay.  You agree, though, that they did
send you this e-mail; correct?                          19:25:07

A    They sent it to my Inova and my Hotmail,
yes.                                                    19:25:16

Q    Okay.                                              19:25:21

A    But I didn't have access to that, so I
couldn't see it.                                        19:25:23

Q    Right.  But when you say they didn't        19:25:29

tell you, are you really saying you didn't receive    19:27:24

their e-mail?  Is that accurate?

A    I received it in the Inova, but of    19:25:41

course, I can't always check that e-mail.  I try

to check it when I have enough time and sufficient

enough, and I'm not delaying patient care, then I

can go and check my e-mail and say, Okay, yeah, I

see it.  And sometimes they would -- they never

ever called me.  It was always me having to call

them in order to find my next assignment, because

they told me to stop calling them to get my next

assignment.  So I stopped.  So I would have hoped

they would have told me and notified me that.

But --

Q    You had been working eight-hour shifts    19:26:32

with Inova Fairfax Tower OR during this

assignment; correct?

A    During this assignment, yes, ma'am.    19:26:48

Q    Okay.  Let's look at Exhibit 40.    19:26:50

    (Exhibit 40 was marked for    19:26:54

identification and attached to the transcript.)

Q    This is Daniels 227 to 230.  Do you    19:27:04

recognize this as an offer you received for a job

beginning February 11, 2025, at Mary Washington

Hospital?

A    Yes.                                                    19:27:22

Q    Okay.  When had you applied for that          19:27:24

position?

A    After I kept telling them that I had          19:27:29

applied, and I wanted to become full time at the

Fairfax Tower, multiple times, and I wasn't

getting no answer back, if they were going to

bring me on full time or not.

Q    Let me start -- my question was, when          19:27:53

did you apply for this position at Mary Washington

Hospital?

A    Some time in between, before my              19:28:04

assignment ended in the original date, the

original date of this one, without me getting any

e-mail.  That's what I'm saying.  I didn't see it,

yeah.

Q    Is this an agency, Aya Healthcare, that        19:28:26

you'd be working for, or would you be directly

employed by Mary Washington Hospital?

A    It was an agency.                          19:28:40

Q    Had you worked with this agency before?   19:28:43

A    No.  This was my first time.              19:28:48

Q    If you continued working for this         19:28:52
agency, could you be assigned to another hospital
after that May 10th date?

A    Yes.  That's what the plan was, yes.      19:29:02

Q    You also mentioned you were trying to     19:29:07
work at Inova Fairfax Hospital Tower OR full time?

A    Yes.                                       19:29:16

Q    When did you apply for a job at Fairfax   19:29:18
Tower OR?

A    I want to say when they brought me back   19:29:26
or beforehand.  I think it was actually in
September.  Before they even dismissed me, I had
already applied in, like, September or October.

Q    Were you interviewed?                      19:29:44

A    No.  That's the one that I kept telling    19:29:47
them, Hey, I put my application in here, can you
pull it?  I just want to stay here.  I want to
come off of the float pool.  I just want to stay
here at this hospital.

Aya Healthcare?

A    I did, after I didn't know what was
going to happen with me at this job.  They never
told me about the extension or anything.  I had
never got word of that.  I was not even aware of
it.

Q    Did anyone tell you you were not being
extended?

A    No.  Nobody told me, but I did ask --
somebody asked me -- one of my coworkers, Patty.
And she was like, Well, why don't you stay here?
I was like, I've been trying to.  I've been
talking to -- not Jamie, because I think Jamie was
off on leave or something.  I don't know.  But
I've been talking to Ashley over and over again,
saying, Hey, Ashley, what about me coming on full
time, blah, blah, blah?  And Patty told me, Oh,
I'll go find out for you.  I'll go down there and
ask them why they won't hire you full time.  Like,
I think you'd be a great fit here, great.  And I
was, like, Me too.  I want just to stay here.  I
just want to come off the float pool.  And she

20:45:38

20:45:58

20:46:03

Q    When was the conversation you're
describing with her?                                              20:48:43

A    It had to be, like, right around this                        20:48:48
time.  Before.  Before I even accepted this one, I
was looking.

Q    Before January?                                             20:48:59

A    Yeah, before January, because I didn't                      20:49:00
know what it was going to be, and I was in the
unknown.  Because every time I would call my two
managers, or one of them, obviously, can you guys
tell me where I'm going next, what am I doing,
they would never tell me.  They told me, Don't
call them, we'll call you.  Don't call me, I'll
call you.  And I was like, Sorry, but I know I'm
used to being, like, the traveler.  And I used to
having four weeks for an assignment to get out.
Four weeks or two weeks before my assignment would
end, I'm used to reaching out to you, or you're
reaching out to me to tell me where is my next
assignment.  And that wasn't happening with me.
Like, it was sometimes, like I told you before, it
was a week after, and I was like, We got to

even see, and I'm at the field. That's dangerous, because, maybe the way that you've been doing this the year before me, you've been here for so long, but how can you count instruments that I can't see myself? That's dangerous. And they didn't like that I was saying those things, and I was like, I'm just trying to be safe for the patient. Like, you're doing cardiac surgery. It's important that you -- it's always, per policy, even their policy, both eyes have to see those instruments when they're counting. But if you can't see it, then how can you say that it's correct. And I told them I felt like it was dangerous and not safe.

Q    Is that 41?                                          20:57:44

A    Which one?                                            20:57:48

Q    41. I think you're already there.                     20:57:49

A    Oh, yes.                                              20:57:54

Q    I'm talking about the bottom e-mail. Do               20:57:57
you recognize that e-mail, dated January 31st, 2025, from you to Kate Theissen, Laura Speer, and Sumar Ali?

A    Yes.                                                  20:58:18

Q   And this is your official resignation letter; is that right?

A   Yes.

Q   And in your e-mail you say, This communication serves as my official notice of resignation from Inova Health, effective Saturday, February 1st, 2025 at 7:00 a.m.; correct?

A   Yes.

Q   You gave them approximately 12 hours's notice of your resignation; is that right?

A   Yes.  Because I was on call that day. On one of those days, I was about to be on call. So that's why I said not on the 31st, because my contract ended on February 1st.  So once my contract ended, I wasn't coming back.

Q   So, to your knowledge, you weren't coming back, because you're resigning?

A   Right.  Because I was resigning and nobody told me about that.

Q   In the top e-mail from Ms. Theissen, she does tell you you have a call shift that extends beyond 7:00 a.m.; correct?

20:58:19

20:58:24

20:58:26

20:58:45

20:58:47

20:58:53

20:59:16

20:59:22

20:59:28

effort to make you quit?

A    I believe so.                                              21:19:34

Q    And you don't know which one, though?                      21:19:37

A    No.                                                        21:19:39

Q    What evidence do you have that this                        21:19:41
unidentified charge nurse was trying to get you to
quit?

A    They changed periodically.  Like, it was                   21:19:49
never the same charge nurse every day.  So I don't
know exactly why they would still even have the
magnet.  I mean, I had contemplated leaving it
back there, but I was like, No.  I'm just going to
keep reminding them, because I don't want to be
responsible for somebody blaming me for taking
that magnet that has my name on it that says I
still got to work 12 hours.  But I don't know why
they couldn't remember that -- I just didn't know
why they couldn't remember.  I know I'm having a
hard time remembering things, but if that magnet
is up there, and you know I can't work anything
over eight hours, then, I don't know.  It wasn't
set in stone.  Like, I would have thought one of

the managers would have took that magnet down, and    21:22:49

just been like, Okay, she's not doing that anymore

[sic].

Q    Even if a magnet reflected a color that    21:21:08

corresponded with 12-hour shifts in your name, you

didn't actually work any 12-hour shifts in 2024 or

2025; correct?

A    No, ma'am.  I couldn't.  I could not.    21:21:27

Q    Can you look at the next paragraph?  You    21:21:31

allege the 12-hour shifts were grueling at times

for you.  What 12-hour shift was grueling for you,

if you didn't work any 12-hour shifts in 2024 or

2025?

A    Before I was -- kept asking them to give    21:21:52

me a disability, before I could provide that

letter, and just every time when I showed it and

tried to put me on that thing, I would say, Hey, I

can't, hey, I can't.  I would just keep saying

that.  Like, I felt that I was having it every

day, sometimes more than once, repeating myself.

And I just can't, so I just carried my letters

around with me.

Q    Right.  I'm asking you to identify what 12-hour shift you worked that was grueling.    21:22:32

A    The ones before.  The ones before.    21:22:42

Q    Before Dr. --    21:22:47

A    Before Dr. Dave, and before the letters, yes.  They were grueling, yes.  Those letters were the ones.    21:22:49

Q    On what unit did you work that 12-hour shift --    21:22:59

A    I worked at Fairfax Tower.    21:23:05

MR. STRELKA:  I know it's the end, please wait until she's done talking.    21:23:11

THE WITNESS:  I'm sorry.    21:23:18

MR. STRELKA:  You guys are kind of --    21:23:21

THE WITNESS:  I'm sorry.    21:23:24

MR. STRELKA:  It's okay.  It's a long day.  Go ahead.    21:23:26

Q    Even when he is speaking to you, he still has to get both of you.  All right.  So the grueling 12-hour shift you're referring to was on the Fairfax Tower OR prior to Dr. Dave's letter; is that correct?    21:23:36

A    Yes.                                                    21:23:56

Q    Okay.  Let's look at Page 6, Paragraph          21:23:58
39.

A    Okay.                                                  21:24:06

Q    You allege and state that you resigned          21:24:10
because the environment was so intolerable on
accommodating, and you would have been terminated,
but for your resignation.  How was the environment
at Inova Fairfax Hospital Tower OR intolerable in
January of 2025?  Did you hear that question?  I
can repeat it.

A    Yeah.  Okay.                                           21:24:45

Q    How was the environment at Inova Fairfax        21:24:46
Hospital Tower OR intolerable in January of 2025?

A    Because I was having to remind them that        21:24:58
I can't work any 12-hour shifts, but they were
constantly putting a magnet up there with me
working 12-hour shifts, and I had to constantly
remind them, like, I can't do that.

Q    When you say them, you're referring to          21:25:23
the charge nurse?

A    The charge nurse or whoever it was in           21:25:27

charge that day, when I would see my name on the    21:27:20

board to work those hours.

Q    What evidence do you have that you were    21:25:39

going to be terminated if you didn't resign?

A    Well, I kept asking Ashley.  Every time    21:25:49

I saw her, Hey, do you have any word, like, on my

application, or can you find it?  I really want to

stay here.  I don't really want to go anywhere

else.  I want to come off the float pool.  I would

really love to be here.  And I just expressed that

to her.  But after what I got from Patty, I just

kind of stopped asking her.

Q    Ashley Smith didn't work in Inova    21:26:27

Staffing Solutions; correct?

A    No, she didn't.  She was the permanent    21:26:33

manager for Fairfax.

Q    Okay.  Do you have any evidence that    21:26:39

Inova Staffing Solutions would have terminated

you, but for your resignation?

A    I do not know, but I know they weren't    21:26:51

giving me my assignments ahead of time, and they

weren't making me aware of it.  And I was like, I

wanted to stay here.  And I just kept voicing my          21:28:45

opinion that I wanted to stay here.  But I just

was --

Q    Anything else?                                        21:27:19

A    No.                                                   21:27:20

Q    Okay. Let's look at Page 7, Paragraph                 21:27:20

49.  You allege that Inova would not have

disciplined you, constructively discharged your

employment, or taken other discriminatory actions,

but for your disability or perceived disability.

Who do you contend disciplined you because of your

disability or perceived disability?

A    Okay.  Which page are you on?                         21:27:51

Q    Page 7.                                               21:27:54

A    Of which one now?                                     21:27:57

Q    Same exhibit, 42.                                     21:27:58

A    Oh, we're back in 42, okay.  Sorry.                   21:28:02

Q    It's Paragraph 49.                                    21:28:08

A    Paragraph 40.                                         21:28:11

Q    49 on Page 7.                                         21:28:16

A    Page 7 of the whole thing.  Sorry.                    21:28:18

Q    That's okay.                                          21:28:24

A     Okay.                                           21:28:30

Q     Who do you believe disciplined you            21:28:31
because of your disability or perceived
disability?

A     I just believe that, because --              21:28:45

Q     Not why, but who?  Which person?             21:28:49

A     Either --                                     21:28:54

        MR. STRELKA:  Objection to form.  Answer    21:28:56
if you can.

Q     Sorry.  Did you answer?  I didn't hear       21:29:04
you.

A     Maybe the managers.                           21:29:10

Q     You say maybe.  What do you mean by          21:29:15
maybe?

A     Because I kept -- I was done with kept        21:29:20
repeating myself to them [sic], like, that I
wanted to keep telling them I can't work 12 hours.
Like, I kept saying that over and over again, but
I kept voicing that.  So nobody was changing or
taking that little plaque down with my name on it.

Q     I hear you.  I want you to listen to my      21:29:49
question.

A    Okay.                                              21:29:55

Q    We're almost done.                                21:29:55

A    Okay.  Sorry.                                      21:29:57

Q    Who disciplined you because of your               21:30:00
disability or alleged disability, as alleged in
Paragraph 29 -- 49?

A    Well, I was on my final warning.  I was           21:30:14
on my final warning already, and --

Q    So did you receive any discipline after           21:30:25
the final warning?

A    No, I did not.  No, ma'am, I did not.             21:30:30

Q    Do you believe you would not have                 21:30:35
received a final warning if you didn't have a
disability?

A    Yeah.  Yeah.                                       21:30:43

Q    What evidence do you have that it was             21:30:45
issued to you because you have a disability?

A    Because this didn't start until I voiced          21:30:54
that I had a disability and that my doctor wanted
me to have accommodations because of my symptoms.

Q    Other than the fact that the discipline           21:31:08
came after your requested accommodations, is there

anything else that makes you believe they're
related?

A    Say that question again.  Sorry.                        21:31:27

Q    Yeah.  Other than the fact that your                    21:31:31
discipline occurred after you requested
accommodations, was there any other reason you
believed you were disciplined because you have a
disability?

A    Discrimination.  Because, I mean, I                     21:31:48
don't look like I have the disability, but that
doesn't -- I didn't know I had it either, but that
doesn't mean they should treat me any different.

Q    Go to the next paragraph, Paragraph 50,                 21:32:11
on this same page.

A    Okay.                                                   21:32:17

Q    How were you meeting Inova's legitimate                 21:32:20
expectations at Inova Loudon Hospital in 2024?

A    I was coming to work on time.  And when                 21:32:42
they did or didn't assign me in a room, I would
help out, what they call, is the core.  So the
core, meaning I would just go to every room and
ask if they needed my help.  And if they weren't,

you know, mean or rude to me, I would definitely

help them, because I felt like that was my job to

help turn over the room, to help set up the room,

and then I would go to another room and help them

as well.  That's why I told you I was missing my

lunch breaks, because I hadn't realized I hadn't

eaten, because I was helping so much.

Q    Did you receive any performance                    21:33:37

evaluations or e-mails or documents reflecting

positive performance from anyone at Inova Loudoun

Hospital?

A    I don't know about Loudon.  I don't                 21:33:51

think I was there long enough.  I mean, they were

all -- not all of them were nice to me.  But, I

mean, even the ones that weren't that nice, later

on, they came and talked to me.  I was like, It's

okay.  I mean, I apologized sometimes, but not all

the time.  But I just tried to just help whenever

I can.  I tried to be as helpful as I can.

Q    Let's look at Page 8, Paragraph 59.  You           21:34:29

allege Inova failed to accommodate you by refusing

to appropriately engage in good-faith dialogue

regarding accommodations, intimidating and discouraging you from pursuing your accommodation request, and denying your accommodation request. Who intimidated and discouraged you from pursuing accommodation request, if anyone?

A    I felt that way.  I don't know if I could say anyone specific, specific, but I felt that way.                                                        21:35:17

Q    No specific person, though, did anything to make you feel that way?                                        21:35:29

Who do you contend denied your accommodation request?                                                21:35:39

COURT REPORTER:  Sorry.  I needed a verbal response.                                                      21:35:45

A    Oh, no.  No.                                          21:35:49

MS. KIRKLAND:  Thank you.  I didn't know you couldn't hear her.                                            21:35:56

Q    Who do you contend denied your request for accommodation?                                              21:36:02

A    Well, when they brought me back, Inova Fairfax brought me back, even though they said they would honor it, they really were not honoring            21:36:09

it.

Q   You're referring to the charge nurses?   21:36:22

A   The charge nurses or whoever makes the   21:36:27
assignments, because I thought the nurse managers
would know that as well.

Q   Do you recall the names of any charge   21:36:37
nurses on that unit during your final assignment?

A   Maybe.  I can't remember the names off   21:36:49
the top of my head.  Maybe Rebecca, but I don't
know her last name.  I remember Rebecca and
Ms. Patty, sometimes she would be.  Ms. Patty,
Patricia, she sometimes would be charge as well.
There was different people.

Q   Look at Paragraph 60.  I'm sorry 61.   21:37:19
You allege that, at all material times, Innova
engaged in unlawful or discriminatory practices
with malice or reckless indifference to your
federally-protected rights.  Who do you feel had
malice or reckless indifference towards your
protected rights?

A   Like, the hospital, the system.   21:37:56

Q   Who?   21:38:00

A     The Inova.                                        21:38:02

Q     But what person at the hospital?                  21:38:03

A     I couldn't say.  I can't pinpoint one             21:38:07
person.  But, I mean, every day, I'm going up to
the board, and the majority of the days, and I
keep repeating myself and repeating myself,
telling you, that, Hey, I can't work that.  I
thought somebody would have took the initiative to
take down the magnet, and just be like, Okay, just
ignore the magnet; she can only work eight-hour
shifts.  But that never happened, and I wasn't
going to do it.  I didn't feel like that was my
place to do that.

Q     So again, you're just referring to the           21:38:58
charge nurses doing that?

A     Charge nurses or the manager, because I          21:39:04
would think that schedule goes through them as
well.  Like, they know how -- I guess they know
where the assignments are too as well.  I think
they have a meeting as well sometimes.  So I'm not
100 percent for sure how each of them come
together in the evening time or on the floor the

next day the assignment is made. I wasn't for sure how they would know, you know, who's going to be where and stuff like that. I don't know.

Q    And if a charge nurse puts up the wrong color magnet for you, do you have any evidence that they did that knowing that they were violating the ADA?          21:39:52

A    That, I could not tell you, if they knew that or not. But I knew I just told them that I couldn't work because of my doctor's orders. I can't work that. And that's all I would say to them. And they would call somebody. Sometimes they would call the manager, and then they'd change it.          21:40:09

Q    What evidence do you seek -- or sorry. What damages do you seek to recover in this action?          21:40:35

     MR. STRELKA: Objection. It calls for legal speculation. Answer if you can.          21:40:46

A    That's a question that I would have to let my lawyer answer that.          21:40:56

Q    You don't know if you've suffered any          21:41:05

So I can't tell you.  I'm just trying my                    21:44:33
best to deal with this, and I have -- I don't
know.  I just try every day.  I'm learning every
day something new, that I may or may not --
because of my disability, it's affecting my life.
I'm suffering, but I don't let the pain get to me,
because I was in tremendous pain every day, and I
try not to show it or deal with it.  So it's hard.
Very, very hard.  And I just -- I go to a mental
health therapist now, a psychiatrist, and I
discuss it.  But every day, people find out about
it.  Sometimes it's hard for them to believe that
I have it.  And I was like, Well, I do.  I'm just
trying to deal with it.  That's all I can tell
you.

Q    On that last assignment, where you           21:45:59
mentioned these magnets, did you not have a
schedule in Smart Square that showed that you were
working five eight-hours shifts?

A    Yes.                                          21:46:14

Q    Okay.  And so, when you show up in the        21:46:16
morning, what would the magnets -- what

consequence is there from your magnet being the

wrong color?

A    I would just have to remind them, Hey, I                    21:46:30

can't.  I'm not able to work that shift.

Q    And then, what would they do in response                    21:46:37

to that reminder?

A    Sometimes, they would take it down.                    21:46:44

Sometimes, they wouldn't, and I would just keep

telling them, Hey, I need to leave.  I would have

to go call -- tell my nurse, because I'm usually

scrubbed in, so I can't leave.  So I'm like, Can

you call the nurse?  So can you call the charge

nurse and let her know, like, remember I have to

get off at 3:00 today?

Q    Did the charge nurses not have access to                    21:47:18

the Smart Square schedules?

A    I thought they all did.  But I don't                    21:47:26

know if they weren't the ones that were part of

the team that actually made that assignment.

So --

Q    And you never complained to anyone in HR                    21:47:43

or Staffing Solutions about this issue with the

magnets?

A    I thought -- maybe I did.  I thought I                    21:47:57
did.  I know I kept telling them that.  I mean,
every day, I just had to just keep reminding them,
and then they would change it.  But --

Q    Who did you complain to?                                  21:48:13

A    Well, that's what I thought the May 24th              21:48:16
letter was for.  That's what I'm thinking that
letter was for.

Q    For May of 2024?  I'm talking about your              21:48:30
last assignment?  I don't know --

A    Oh, my last one, no.  Well, that's what              21:48:38
I'm saying, like, I thought maybe that's the
reason.  They should already have that evidence
that, Hey, I'm only supposed to work these.

Q    Okay.  In the last assignment at Inova               21:48:55
Fairfax Hospital --

A    Okay.                                                     21:49:03

Q    -- where you're saying you have five                 21:49:03
eight-hour shifts but your magnet color is not
always corresponding to that schedule, did you
complain to anyone during that last assignment?

A    No.  I was afraid to.                          21:49:22

     MS. KIRKLAND:  I have no further            21:49:24

questions.  Do you have anything?

     COURT REPORTER:  What was the answer?       21:49:30

I'm sorry.

Q    No.  I was afraid to.                          21:49:34

A    I was afraid to.                               21:49:36

     MR. STRELKA:  Oh, okay.  No.  I don't       21:49:38

have any questions.  Thank you very much.  And I

already placed my order.  You're good to go, my

dear.

     THE WITNESS:  Okay.                         21:49:52

     COURT REPORTER:  Do you want to order       21:49:57

anything?

     MS. KIRKLAND:  I would like to order it.    21:49:59

Electronic delivery is fine.

     COURT REPORTER:  I ask that we remain in    21:50:18

the room so I can --

     MR. STRELKA:  I am not going to remain      21:50:22

in the room.  She is not going to remain in the

room.

     MS. KIRKLAND:  I can help you with          21:50:30

spellings.

MR. STRELKA:  She can help you with                21:50:34

spellings.

COURT REPORTER:  Perfect.  We are going            21:50:36

off the record.

(Off the record at 2:22 p.m. EST.)                 21:50:40

21:50:47

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Samuel Pachon, the officer before whom the foregoing proceedings were taken, do hereby certify that said proceedings were electronically recorded by me; that the foregoing transcript, to the best of my ability, knowledge, and belief, is a true and accurate record of the proceedings; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Notary Registration No.:  00278263

My Commission Expires:  02/29/2028

*Samuel Pachon*

_____

SAMUEL PACHON, NOTARY PUBLIC FOR

FOR THE COMMONWEALTH OF VIRGINIA

CERTIFICATE OF TRANSCRIBER

I, Jacalyn Mann, do hereby certify that the foregoing pages, to the best of my ability, are a true and correct transcription from the official electronic sound recording and annotations of the proceeding taken on April 1, 2026, in the above-entitled matter; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

Jacalyn Mann

April 6, 2026.

*Jacalyn Mann*